**Richmond**

CITY OF RICHMOND

V.

PAUL GORDON, ET AL.

September 9, 1982.

Record No. 791836.

Present: All the Justices.

*Reginald M. Barley, Assistant City Attorney (C. Tabor Cronk, Assistant City Attorney,* on briefs), for appellant.

*James F. Pascal (Keith D. Boyette; Hirschler, Fleischer, Weinberg, Cox & Allen,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is an appeal by a municipality from the action of a trial court in reducing real estate assessments on income-producing property. The basic question is whether the presumption in favor of the validity of the assessments was overcome. We hold it was not and reverse, finding in favor of the taxing authority.

The subject property is an apartment complex, known as Rittenhouse Square, located among low income housing in the City of Richmond. Constructed in 1968, the complex is on 13 acres of land. There are 19 separate buildings containing 319 residential apartment units. The City determined that the fair market value of the property as of January 1, 1974, was $2,760,800 and as of

January 1, 1975, was $2,300,000. Real estate taxes were assessed accordingly for those years.

Contesting the assessments, the owners of the property, appellees Paul Gordon and others, members of a partnership known as Rittenhouse Square Associates (hereinafter collectively referred to as the Taxpayer), filed separate Petitions For Relief From Erroneous Assessment against the City in 1975 under Code § 58-1145. Following a 1977 ore tenus hearing in the consolidated cases, the trial court decided in favor of the Taxpayer, reducing the assessments for both years. We awarded the City an appeal from the September 1979 judgment orders.

The following table summarizes the values fixed by the City Assessor; the witness J. B. Call, III, the City's independent appraiser; the witness C. W. Simmons, the Taxpayer's appraiser; and the trial court. The experts evaluated the property by employing the capitalization of income approach.

| | 1974 | 1975 |
|----------|-------------|-------------|
| Assessor | $2,760,800 | $2,300,000 |
| Call | 2,500,000 | 2,600,000 |
| Simmons | 2,000,000 | 2,100,000 |
| Court | 2,000,000 | 2,100,000 |

During the evidentiary hearing, the Taxpayer, through its expert and other witnesses, sought to demonstrate the City had overvalued the subject property in both years. The Taxpayer showed the complex was adjacent to the City's sanitary landfill and a cemetery. There was evidence of offensive odor throughout the apartments caused by the city dump and of "big rats" that "walk over" from the dump. The Taxpayer claimed that as a result of these and other conditions prevailing in the area, there were high vacancy rates during the years in question, 27.6 percent in 1974 and 34.2 percent in 1975, with declining net profits.

Simmons, who made his "retrospective appraisal" for the Taxpayer during September of 1977, stated that the assessed values for 1974 and 1975 were "clearly and convincingly too high." Describing his appraisal technique employing the income approach, Simmons testified that he inspected the property; examined the Taxpayer's actual gross income, net income, and expenses; analyzed the vacancy rates; reviewed the rental market in the immediate area; considered the "potential of the project" for

producing income; sought to ascertain the anticipated gross income of the project as compared with similar complexes in the area; and studied the "peculiar problems of Rittenhouse," which was called "Rottenhouse Square," according to one witness, because the project had a drug problem in the past.

Simmons opined that "almost all" of the "indicators" he had for 1974 resulted in a valuation of $2,000,000, and $2,100,000 for 1975, noting that the "extremely high" vacancy rates for those years were not attributable to poor management but to "market factors."

Richard A. Chandler, the City Assessor, testified that, using a uniform procedure, the appraisals of apartment complexes in the City are reviewed "constantly and continually." As market data are collected, the Assessor conducts an ongoing cost, sales, and income analysis, utilizing certain "value trends or value indicators," such as "rental levels, expenses, operation ratios, capitalization rates, yield rates, . . . sales of any apartments and current construction costs of various apartments." Whenever the analysis suggests that the value of particular property is different from the tax assessment, then "appraisal updates—reassessments" are initiated.

Chandler further testified that in 1972 there were "indications" that the market value of apartments in the City had begun to exceed the then assessed values. Thus, all apartments, including Rittenhouse Square, were scheduled for reappraisal and updating during 1973 for the January 1, 1974 assessment. The Assessor's staff during 1973 mailed questionnaires to every apartment owner seeking certain information, including "income statements," that would enable the Assessor to make accurate appraisals of the property.

Chandler stated that an "appraisal team" consisting of a supervising appraiser, plus one or more senior appraisers who actually performed the work, analyzed the data previously collected, and developed "economic rental levels." The team developed "typical operating expenses," indicated "gross cap rates," and developed a "gross rent market" described as a "price earnings ratio," which could be applied to the updating of each apartment appraisal. As a part of the process, according to Chandler, the senior appraisers of the team "field-check" each apartment project. The Assessor also stated that of the accepted appraisal methods the capitaliza-

tion of income approach was given the greatest weight in appraising apartments, and that it was used for Rittenhouse Square.

Garland Johnson was the City's Senior Appraiser on the "team" responsible for evaluating the property in question. He testified that in making the appraisals he "estimate[d] the gross potential income of the subject property," which is "what the property should rent for if all the units were occupied." This was accomplished "by looking at other properties in the general area of the subject, obtaining rents from these projects, and adjusting, if possible, the rents that the subject should command." Using the standard procedure, according to Johnson, of gathering data in April or May, and finishing in December, for the assessment effective the following January 1, he made inquiry of the rental manager of the subject property to ascertain the rents in effect at that time, and whether the rents were going to change in the immediate future. After obtaining this information, Johnson consulted his office files, which indicate the number and size of the apartment units, in order to compute the "economic rents" and the "gross income figure" used for his appraisal.

Johnson testified that he requested the Taxpayer to submit operating and expense statements to be used in connection with the 1974 appraisal and that he "never could get the information," despite promises from the Taxpayer that it would be forthcoming. The City's evidence showed that efforts to obtain that data continued without success into 1974 and past March 15, when the Assessor's administrative review period expired for the 1974 valuation.

Johnson testified that finally he received an operating statement from the Taxpayer for the period January 1, 1974 to September 30, 1974, indicating a higher vacancy rate than experienced by the typical apartment project in the area. As a result, Johnson fixed the 1975 assessment at $2.3 million, about $400,000 below the 1974 valuation. He also testified that if, at the time of the 1974 appraisal, he had been able to use actual figures which established "a track record" for the subject property, the assessment for that year would probably have been between $2.3 million and $2.7 million. He responded during cross-examination, when asked if he "now" believed the 1974 assessment was "too high," that: "It's a possibility. I don't know."

Johnson further testified that in making his appraisals he took into account the fact that "some of the buildings face the dump,"

which, according to the evidence, was in operation in 1968 when the complex was constructed.

The witness Call, an independent appraiser who made "retrospective appraisals" at the City's request for the years in question, testified in support of his valuations set forth in the foregoing table.

The trial court, in a letter opinion, decided that the Taxpayer had "clearly rebutted" the presumption of correctness that attached to both assessments. The court decided that the evidence "established more than a mere disagreement between expert appraisers," and held the assessments erroneous.

On appeal, the Taxpayer argues the trial court correctly declared the assessments invalid. It contends "[t]he City cannot disregard the actual income and expense figures for Rittenhouse Square for periods prior to the date of the determination of fair market value." Noting the trial court's finding "that the City did, in fact, disregard certain actual income and expense figures" concerning the subject property, the Taxpayer argues the City's use of pro forma figures was improper. The Taxpayer says that "[b]ecause the complex was being utilized at its highest and best use, the performance of other apartment complexes in the City of Richmond cannot be arbitrarily imposed upon Rittenhouse Square." The Taxpayer urges that the performance of other like income-producing property is "entitled to little weight when actual income and expense experience was available for the appraised property at the time of the appraisal." The Taxpayer's argument is built on a faulty premise.

The record shows without contradiction that actual income and expense figures were not available to the City during its preparation of the 1974 appraisal; indeed, the Taxpayer failed to furnish such information in response to repeated requests by the Assessor.[1] The City nevertheless used other available, actual information, such as the amount of rents being charged at the subject complex, in computing economic rent for the purpose of capitalizing income, a procedure specifically approved by us recently in *Fairfax County* v. *Nassif,* 223 Va. 400, 290 S.E.2d 822 (1982). And for the 1975 assessment, the record likewise shows the As-

---

[1] During the 1982 session, the General Assembly enacted Code § 58-769.3:2, effective July 1, 1982, which permits real estate assessors to require owners of income-producing real estate to furnish the Assessor income and expense statements attributable to each parcel of realty. Acts 1982, ch. 619.

sessor considered, along with other information, a 1974 nine-month operating statement, eventually furnished by the Taxpayer. Therefore, we reject the Taxpayer's contention that the Assessor employed faulty methodology in reaching the determinations of fair market value for the years in issue. To the contrary, the record shows the City employed a thorough and professional appraisal procedure, using objective information when available.[2]

Secondly, the Taxpayer argues its "evidence rebutted the presumption of correctness which applies to the City's determination of fair market value." In a variation of its initial contention, the Taxpayer argues the evidence shows and the court correctly found that "the City constructed an artificial income and expense situation for Rittenhouse Square without reference to the actual experience of the apartment complex and without reference to the unique factors which differentiated the complex from other apartment complexes in the City of Richmond." The Taxpayer maintains the City disregarded evidence which should have been controlling in that the actual experience of 1974 and 1975 showed "the absurdity of the City's artificial estimates." The Taxpayer says the appraisals were "based upon pure speculation and conjecture" and it has shown there was "manifest error in the manner of making the estimate[s]." We disagree.

Under Code § 58-1145, as pertinent here, the Taxpayer has the burden "to show that the property in question is assessed at more than its fair market value." We repeatedly have said that in a proceeding under this statute, "there is a clear presumption in favor of the validity of the assessment." *Fairfax County* v. *Leasco,* 221 Va. 158, 165, 267 S.E.2d 608, 612 (1980). The taxpayer must show "manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded." *City of Norfolk* v. *Snyder,* 161 Va. 288, 293, 170 S.E. 721, 723 (1933). And because fixing property values is a matter of pure opinion, the courts must be hesitant, within reasonable bounds, to set aside the judgment of assessors; otherwise, the courts will become boards of assessment "thereby arrogating to themselves the function of the duly constituted tax authorities." *Richmond, Fredericksburg and Potomac Railroad* v. *State Cor-*

---

[2] At the bar, the Taxpayer argued that because full, complete, and accurate data eventually became available to the taxing authority months after the assessments had been made and the taxes imposed, there was a mandatory duty on the City, even during the course of this litigation, to reduce the valuations. We dismiss such a notion out of hand.

*poration Commission,* 219 Va. 301, 313, 247 S.E.2d 408, 415 (1978).

Having already disposed of the Taxpayer's complaint that the City employed an invalid method of appraisal, we will focus on the balance of the second contention, *i.e.,* that the City failed to consider certain unspecified "unique factors" of the subject property and that the "actual experience" of 1974 and 1975 demonstrates the City's valuations were improper.

■ We assume the "unique factors" to which the Taxpayer alludes relate to the location of the complex. The record is clear that Johnson did, in fact, consider the peculiar site of the apartments, adjacent to the City landfill, and that they were in an area of low income housing. Moreover, the City appraiser made a "field-check" of the subject property, and certainly was cognizant of any odor or other offensive factor present that could influence value.

■ The effect of the Taxpayer's "actual experience" argument is that an appraisal like Simmons', made after the fact in 1977 based on full and refined data for 1974 and 1975, should override the presumption in favor of the validity of the assessments properly made before the fact for those years. We will assume, and not decide, that evidence of actual operating figures, such as income, expenses, and vacancy rates, developed after taxes have been imposed is relevant when property has been valued by use of the capitalization of income approach. But such evidence is not conclusive and is merely one of the factors to be taken into consideration by the trial court in determining whether the challenged assessment is excessive. *See American Viscose Corp. v. City of Roanoke,* 205 Va. 192, 196, 135 S.E.2d 795, 798 (1964).

■ As we have stated, because of the Taxpayer's refusal to respond in 1973 and early 1974 to the City's request for actual data, the 1974 assessment of necessity was based, in the main, on pro forma figures. Had the Taxpayer disclosed "the track record" for the complex when asked to do so, it is likely the 1974 assessment would have been lower. At any rate, the information was withheld and the City proceeded to use such data as was available. Accordingly, the City has not "disregarded" controlling evidence; it was not privy to all the important actual figures.

■ Moreover, we cannot say that "manifest error" has been demonstrated by the Taxpayer for 1974 merely because its expert fixed a lower value for that year using figures which, in part,

should have been made available to the City at the time of its appraisal. As to the 1975 assessment, made after the City had received actual experience figures, particularly 1974 vacancy rates, the most that can be said from the Taxpayer's perspective is that there is a reasonable difference of opinion among the experts as to the value of the property which ranges from an estimate below to an estimate above the value fixed by the City.

 Given the circumstances of this case, we hold the assessments in question come "within the range of a reasonable difference of opinion," *Snyder,* 161 Va. at 293, 170 S.E. at 723. Thus, when considered in light of the presumption of validity, we cannot say they are erroneous.

For these reasons, we hold the trial court erred in reducing the assessments for 1974 and 1975. Consequently, we will reverse the orders appealed from and enter final judgment dismissing the respective petitions.

*Reversed and final judgment.*