## CIRCUIT COURT OF THE CITY OF ALEXANDRIA

Van Dorn Associates

v.

City of Alexandria

Jamestown Associates

v.

City of Alexandria et al.

December 2, 1983

Cases No. 8111 and 8112

By JUDGE ALBERT H. GRENADIER

The petitioners, Van Dorn Associates (at Law No. 8111) and Jamestown Associates (at Law No. 8112), bring these actions against the City of Alexandria and its Director of Real Estate Assessments under the provisions of § 58-1145 et seq. of the Code of Virginia and allege that their properties were assessed at more than their fair market value for the year 1982. They seek a reduction in the assessed value and a refund of taxes paid based upon the erroneous assessments.

Under § 58-1145 of the Code of Virginia the burden of proof is on the taxpayer to show that the property in question is assessed at more than its fair market value. In a proceeding under this statute "there is a clear presumption in favor of the validity of the assessment." City of Richmond v. Gordon, 224 Va. 103 (1982); Fairfax County v. Leasco, 221 Va. 158 (1980). To sustain his burden under Code § 58-1145 the taxpayer must show "manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded." City of Richmond v. Gordon, supra; City of Norfolk v. Snyder, 161 Va. 288, 293 (1933). And because fixing property values is a matter of pure opinion, the courts must be hesitant, within reasonable bounds, to set aside the judgment of assessors; otherwise, the courts will become boards of assessment "thereby arrogating to themselves the function of the duly constituted tax authorities." Fairfax County v. Leasco, supra; R. F. & P. RR. Co. v. State Corporation Commission, 219 Va. 301 (1978).

Applying the foregoing principles and upon a full consideration of all of the evidence, the Court is of the opinion that the petitioners have fully sustained their burden of proof that the assessments for the year 1982 are erroneous and that they are entitled to appropriate relief.

Under Article X, § 2, of the Constitution of Virginia all real estate must be assessed for taxation at its fair market value. "Fair market value" of property is the price it will bring when it is offered for sale by one who desires, but is not obliged to sell it, and is bought by one who is under no necessity of having it. In estimating that value, all of the capabilities of the property and all the uses to which it may be applied or for which it is adapted, are to be considered, but it is not a question of the value of the property to the owner. Tuckahoe Woman's Club v. City of Richmond, 199 Va. 734 (1972).

"Fair market value" is the present actual value of the land with all its adaptations to general and

special uses, and not its prospective, speculative or possible value based on future expenditures or improvements that is to be considered. Fruit Growers Express v. City of Alexandria, 216 Va. 602 (1976). Fair market value is determined upon the basis of the most advantageous and valuable use of the land, or stated differently, its highest and best use, having regard to the existing demands of the community or such as may reasonably be expected in the near future. Appalachian Power Co. v. Anderson, 212 Va. 708 (1972). In Fruit Growers Express the court held that a valuation based upon potential income from future or prospective uses is inadmissible because it is uncertain and conjectural. In appraisal terminology, highest and best use is that reasonable and probable use of the property that supports the highest present value as of the effective date of the appraisal. It is that use from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible and maximally productive. As the highest and best use conclusions provide the bases for the appraiser's fair market value analysis, the remainder of the valuation process is conducted in relation to these conclusions. Consequently, it is essential that highest and best use conclusions accurately relate to the motivations of the market for the subject property.

It is apparent, therefore, that "highest and best use" and "fair market value" are inextricably tied together. And as the court correctly observed in Tuckahoe, in considering the highest and best use of property the existing use may be of no particular consequence. The landowner may not claim a lower value by reason of his failure to utilize his property to its full advantage. On the other hand, the tax assessor may not claim a higher value by ascribing to the property a highest and best use that is prospective, speculative or unrealistic in view of existing market conditions and other practical, common sense considerations.

The defendants contend, and their assessments are based upon the premise that, the highest and best use

of the subject properties on January 1, 1982, was as a condominium conversion. This contention is made in the face of substantial, credible and uncontroverted evidence to the contrary that on the assessment date the prime interest rate was at an all-time high of 21 - 21½%; that residential mortgages were at 15½% - 16%, plus points; that end loans for condominium purchasers were unobtainable; that condominium sales were in serious trouble; and that the economy was in a deep recession. Such evidence strikes at the very heart of the defendants' theory of highest and best use. It is quite apparent that controlling evidence on this point was totally disregarded by the assessor and by the defendants' experts. Nor was evidence presented by the defendants which would have demonstrated the economic viability of a condominium conversion.

In addition, before the petitioners could have undertaken a condominium conversion, they would have had to obtain waivers or variances from the City for a substantial number of parking spaces as well as possible side lot requirements. Whether such waivers or variances would have been granted is highly speculative.

The Court finds from the evidence that the highest and best use of the subject properties as of January 1, 1982, was not as a condominium conversion but continued use as a residential rental property.

There are three basic methods by which property can be appraised: the cost or replacement approach, the market data approach and the income approach. In the case of older projects, such as the subject properties, the cost or replacement approach is not a preferred method of appraisal because of the inability of the appraiser to accurately evaluate the depreciation factor. Most of the expert witnesses seemed to concede that the other two appraisal methods are inherently more reliable and should be used if appropriate data is available.

The appropriate method of determining value by the market data approach is to assemble evidence of sales of comparable property. Having erroneously determined

that the highest and best use of the subject properties was as a condominium conversion, the defendants presented as comparable sales a number of sales of apartment projects of varying size, mix, condition and location which were actually sold for conversion to condominiums and many of which were so documented prior to sale. The evidence clearly showed these sales prices to be much higher than those of projects that were purchased for continued use as rental property. Not only did the assessor fail to give adequate consideration to sales of rental property not sold for condominium conversion, but the sales that were used were not comparable in size, mix, condition and location to the subject properties. The question of admissibility of prior sales of comparable property is one left largely to the discretion of trial courts. Edwards v. State Highway Commissioner, 205 Va. 734 (1965). The petitioners' experts could not find comparables that they were comfortable with, and the Court has the same problem.

Using a comparable that has a different highest and best use is an inappropriate appraisal technique. Having based his appraisal upon an erroneous highest and best use and having failed to use sales that were truly comparable, the Court is compelled to find that the estimates of value reached by the assessor by the market data approach are clearly erroneous. The defendants' experts have fallen into the same trap and their estimates are likewise defective.

This leaves the income approach as the remaining viable method of evaluation. The assessor and the defendants' expert witnesses, using the "comparable sales" referred to above, determined an "overall rate" by dividing the net operating income of a project by its sale price. This overall rate is then used to capitalize the income to determine fair market value. This is sometimes called direct capitalization and is an acceptable method of determining fair market value. However, in direct capitalization it is absolutely essential that the market comparables be highly comparable to the property being appraised. If they are not, the overall rate will be inaccurate and its

application in capitalizing income will result in an erroneous value.

In this case the so-called comparable sales prices were inflated, leading to an artificially low overall rate and a consequently higher value. If only non-conversion property sales had been used, the overall rate would have been much higher, leading to a lower value. The inherent danger in using the overall rate as the capitalization rate is apparent in this case. It should also be observed that the overall rate is merely another way of expressing market data and is not a classic utilization of the capitalization of income approach.

In assessing property in the absence of credible market data the capitalization of income approach is the preferred method of appraisal. In the income approach the net operating income is capitalized to determine fair market value. The accepted appraising method is to capitalize the net operating income at a rate which will provide for the recapture of the investment, plus a proper return to the investor. The rate of return on similar investments, the risk factors, depreciation, taxes and the rate of return of other investment opportunities in the market place should be considered in determining an appropriate capitalization rate.

In this case the assessor and the defendants' experts used an overall rate of 7% as the capitalization rate. Capitalizing the net operating income of $800,000.00 (using 1980 figures) at 7% yielded a value of $11,500,000.00. The petitioners' experts capitalized the actual 1981 net operating income of $892,500.00 at 10%, one reaching a value of $8,925,000.00 and the other rounding it off to $9,000,000.00. It was conceded that actual rents and economic rents were the same and that the net operating income figures were accurate. The Court is aware that the use of the capitalization method is far from an exact science and that there can be honest differences of opinion among the experts concerning what constitutes a reasonable rate of return or what capitalization rate is appropriate.

It is the opinion of the Court, however, that the 7% capitalization rate, based upon the use of improper criteria (non-comparable sales), is not supported by the weight of the evidence and is clearly erroneous. This error is fundamental, and not merely the product of an honest difference of opinion among the experts. As previously noted, the Court has no confidence in the comparability of the market data and believes that the development of the capitalization rate should take into consideration the factors enumerated above. The Court is of the further opinion that the evidence supports a capitalization rate of 10% and a total fair market value of $9,000,000.00 for the subject properties.

It is noted that the 1982 assessment is over $4.2 million more than the 1981 assessment. In the absence of physical changes in the property or some change in its legal status, such as a condominium or cooperative conversion, it is difficult to perceive how an increase of this magnitude can be justified. Under existing law does not the presumption of correctness apply to the 1981 assessment as well as the 1982 assessment? How can they both be correct? The defendants have failed to adequately answer these questions.

Under existing law real estate is assessed annually. This allows the assessor to be sensitive to changes in the property which may affect its value and to react promptly to such changes. The assessor should not, however, react before such changes occur, and that is precisely what he did in these cases.

Counsel for the petitioners should submit to the Court for entry an endorsed order consistent with this letter opinion, setting the fair market value of Jamestown I at $5,350,162.00 and Jamestown II at $3,649,838.00, for a total of $9,000,000.00 and providing a refund to the petitioners of that portion of the taxes paid for the year 1982 in excess of that valuation.