## CIRCUIT COURT OF FAIRFAX COUNTY

Robert J. J. Seaone

v.

Fairfax County
Board of Supervisors et al.

January 10, 1995

Case No. (Law) 117388

BY JUDGE ARTHUR B. VIEREGG, JR.

Plaintiff Robert J. J. Seaone filed the captioned action against the Board of Supervisors of Fairfax County and Paul E. Smith, the Supervisor of Assessments of Fairfax County (collectively referred to as the "County") to correct tax assessments made against his improved real property, the Merrifield Plaza Shopping Center ("Center")[1] for the 1989, 1990, 1991,

---

[1] For purposes of this letter opinion, the term "Center" may (depending upon the context in which the term is used) refer either to only the shopping center situated on Seaone's land or to both the shopping center and the land on which the Center is situated. All

and 1992 tax years. Evidence was received on January 19, 24, and 25, 1994, after which this case was taken under advisement.[2] I am now prepared to furnish my decision to the parties and counsel.

## I. *An Overview of the Case*

The Center is income-producing real property. Both sides agree that the County's appraisers used a proper methodology to value it: the capitalization of income approach. This appraisal technique, when used to appraise income-producing property for tax purposes, requires the appraiser to determine the amount of rent for which space in the income-producing property could have been leased for the tax years in question. This potential rent is referred to as "economic rent." Moreover, the Supreme Court of Virginia has mandated that, in making determinations of economic rent, taxing authorities consider the actual rents received for the subject property. *Tysons Int'l v. Board of Supervisors*, 241 Va. 5, 400 S.E.2d 151 (1991) (citing four earlier decisions in which Fairfax County had failed to take actual rents into account in appraising income-producing property).

Seaone advances a narrow basis for challenging the tax assessments against the Center. He contends the County failed to take the Center's actual rents into account in determining economic rent for purposes of assessing the Center for the years in question.

This letter opinion is divided into four parts: (1) a summary of certain pretrial proceedings and rulings; (2) a summary of the evidence presented at trial; (3) an analysis of how Virginia legal principles governing assessments of income-producing property should be applied; and (4) a final decision.

## II. *Pretrial Proceedings*

Seaone filed his petition initiating this action on August 6, 1992. In a February 2, 1993, status order, this Court set the case for trial on August 11, 1993. Pursuant to the provisions of that order, Seaone identified three

---

parties agree that certain parts of the Center are not subject to the assessment, the Hardee's fast food restaurant and a service road.

[2] At the request of the Court, a transcript of the trial was prepared. The Court will, on occasion, refer to that transcript ("Tr.").

expert witnesses to be called at trial: two real estate appraisal witnesses, J. Dennis Fincham and Michael Jefferies; and an expert to testify as to leasing and managing commercial property, Craig Lussi. Seaone advised the County that Lussi would testify as to the condition of the Center as well as "the going lease rate for like properties." (Pet. Desig. Experts, May 3, 1993.)

By order of July 26, 1993, this Court permitted Seaone to take the *de bene esse* deposition of Fincham because Fincham was "outside the Commonwealth." Fincham's deposition was taken on July 27, 1993. Shortly before trial, however, the County objected to the introduction of the deposition testimony, because Fincham was not licensed as an appraiser by the Commonwealth. By order of August 6, 1993, this Court excluded Fincham's testimony "unless Michael Jefferies certifies that Fincham's testimony has been reviewed by him and he attests that the appraisal and/or Fincham's testimony is accurate and complete."

On the morning of trial, the Board of Supervisors renewed its motion to exclude Fincham's deposition testimony on the ground that Jefferies was not qualified to certify Fincham's appraisal. By order of September 21, 1993, the Court continued the case "to allow [Seaone] to obtain a properly licensed Virginia appraiser to review and certify Fincham's February 18, 1992, appraisal." Subsequently, Seaone designated Thomas E. Reid to certify Fincham's appraisal.

## III. *The Evidence and Facts Established at Trial*

The Center is located at the intersection of Lee Highway and Gallows Road in Fairfax County. Its construction was completed in the latter half of 1970. It is a strip shopping center, housing two "anchor" tenants and approximately fifteen or sixteen smaller stores.

In February 1969, in anticipation of the construction of the Center, Seaone entered into an anchor lease with the Great Atlantic & Pacific Tea Company for approximately 25,100 square feet of space for use as a grocery store ("A. & P. Lease"). (Pet. Ex. 1B.) A. & P. agreed to pay Seaone $4,846.88 as monthly rent plus certain specified "pass-through" expenses and percentage rent calculated on the basis of A. & P.'s gross receipts at the store. The term of the A. & P. lease was twenty years, beginning on December 1, 1971, plus four extensions of five years each

creating a total potential lease term of forty years. The A. & P. Lease was still in effect at the time of trial.

In April 1969, Seaone entered into an anchor lease with the Dart Drug Corporation for approximately 18,894 square feet of commercial space for use as a drug store ("Dart Drug Lease"). (Pet. Ex. 1A.) Dart Drug agreed to pay Seaone $60,000 in annual rent plus certain specified percentage rent calculated on the basis of the annual gross receipts of its store at the Center. The term of the Dart Drug lease was twenty years, beginning on or about October 1, 1970, plus seven extensions of five years each, a total potential lease term of fifty-five years. The Dart Drug Lease was subsequently sold to the Phantles drug chain and later purchased by the Drug Emporium in connection with a sale under the auspices of the United States Bankruptcy Court. It was likewise still in effect at the time of trial.

For the 1989, 1990, 1991, and 1992 tax years, the Supervisor of Assessments for Fairfax County assessed the value of the Center as follows:

| Tax Year | Assessment |
|----------|------------|
| 1989 | $6,958,595 |
| 1990 | $9,976,635 |
| 1991 | $9,970,545 |
| 1992 | $9,482,500 |

The assessed value of the Center therefore increased by 43% between 1989 and 1990.

The County's assessments were based upon an independent appraisal prepared by use of the capitalization of income method, the preferred method for valuing income-producing real estate such as shopping centers. During his testimony as part of Seaone's case-in-chief, Richard Green of the County Assessor's Office summarized information contained in County records referred to as "Commercial Data Field Cards." (Pet. Exs. 7-10; Def. Exs. 1-4.) These cards contained appraisal data and calculations which formed the basis for the County's assessments of the Center for the years in question. Green further testified that in assessing the Center, the County (1) determined the gross economic rent for the Center; (2) adjusted the gross economic rent figure for various factors; (3) subtracted operating expenses from that adjusted gross economic rent figure to arrive at a net

economic rent figure; and (4) divided the net economic rent figure by a capitalization rate ("cap rate")[3] to arrive at the value of the Center.

The County's Field Data Cards introduced at trial showed that the County's tax appraisers determined the following actual rent was received by Seaone for the 1991 and 1992 tax years; and that they had determined that the following economic rent should be imputed to the Center for the tax years in question.

| Tax Year | Actual Rents | Economic Rents |
|----------|-------------|----------------|
| 1989 | Unknown | $ 853,082 |
| 1990 | Unknown | $1,171,678 |
| 1991 | $502,514 | $1,171,678 |
| 1992 | $377,722 | $1,167,178 |

The County regularly requests income and expense information from owners of income-producing property. However, for the 1989 and 1990 tax years, Seaone did not furnish such information to the County. Accordingly, as the above chart shows, the County had no actual rent information with respect to the Center for those years when it made its assessments for 1989 and 1990. The County did receive income and expense information from Seaone for the 1991 and 1992 tax years.[4]

The County's Field Data Cards also reflect that in preparing assessments for the years in question, the County relied upon the following actual and economic rental rates for the Center's two anchor tenants and for most of the smaller stores:

---

[3] The Court gleaned the following information with respect to "cap rates" from the testimony of expert witnesses in the case. A cap rate represents a rate of return on an investment which a hypothetical, knowledgeable investor would expect to receive from that particular type of investment. The cap rate varies directly with the amount of risk involved with a particular type of investment. In general terms, the value of a particular investment may be derived by dividing the known annual income from that investment by the cap rate. The appraiser, however, must use a cap rate which corresponds to the type of income figure into which it is divided. Accordingly, if the income is a net figure (excluding real estate taxes), the cap rate chosen must be one appropriate for such a net income stream. Furthermore, Green testified that different cap rates are used depending upon what interest is being appraised. Since Seaone does not contest the cap rates used by the County's assessors, they are not subjects of dispute in this case.

[4] Some or all of this information was apparently furnished by Seaone to the County as part of his appeal of the County's assessments to the Board of Equalization.

| Tax Year | Actual Rent | | Economic Rent | |
| --- | --- | --- | --- | --- |
| | Anchor | Small Stores | Anchor | Small Stores |
| 1989 | Unknown | Unknown | $7.75/sf (A.& P.) $12.75/sf (Dart Drug) | $13.75/sf |
| 1990 | Unknown | Unknown | $9/sf(A.& P.) $10/sf(Dart) | $19/sf |
| 1991 | $2.31/sf | $3.16/sf | $9/sf(A.& P.) $10/sf(Dart) | $19/sf |
| 1992 | $2.31/sf | $3.09/sf | $9/sf(A.& P.) $10/sf(Dart) | $19/sf |

(Pet. Exs. 7-10; Def. Exs. 1-4.)

Seaone's next witness, Lussi, testified that the actual rents received for Center store space in 1989 and 1990 approximated those received in 1991 and 1992 (which were reflected on the County's Field Data Cards). He further testified that those rents included all of the rental income, including pass-throughs and percentage rents) received by Seaone for the four years in question.

Lussi testified as to actual rents charged by Seaone to specific tenants of the Center and opined that the aggregate Center economic rent exceeded the rent actually charged by Seaone but was less than the economic rent attributed to the Center by the County's appraisers. (Pet. Ex. 11.) The Court, however, accords little weight to Lussi's economic rent testimony for the following reasons. His credentials to furnish opinion testimony were not much developed. While he has a real estate broker's license, no experiential basis was advanced demonstrating his knowledge of economic rents on account of real estate brokerage activities. While Lussi did testify that he had experience in leasing the Center, Seaone did not establish that Lussi had experience in leasing other Northern Virginia shopping centers. Furthermore, in the course of his testimony, Lussi appeared to confuse actual rents at the Center with economic rents. At one point in his testimony, he hesitated to even furnish opinions with regard to market or economic rents at the Center, because he was not in charge of leasing

operations for that year. On balance, the Court finds that Lussi's testimony as to economic rents was not based upon a knowledge of the market but rather on his experience in negotiating leases with tenants and potential tenants at the Center.

Lussi more persuasively opined that the Center's rents for the years in question were not necessarily comparable to rental rates charged at other Northern Virginia shopping centers, because the Center had long been in need of both repairs and refitting. He summarized the condition of the Center and its need for substantial capital improvements and opined that Seaone would have had to invest substantial sums of money for such repairs and refitting to successfully charge the economic rent imputed to the Center by the County's appraisers.

The County moved to bar Lussi's testimony as to actual rents received for the Center for the 1989 and 1990 tax years, because Seaone had failed to provide income and expense information requested by the County for those years. The County relied upon *Richmond v. Gordon*, 224 Va. 103, 294 S.E.2d 846 (1982), and Virginia Code § 58.1-3294 (successor to Virginia Code § 58-769.3:2). The Court denied that motion because the Board failed to demonstrate that Seaone had received requests for such information.

In *Gordon*, the taxing authority had repeatedly requested such information. The Supreme Court considered that circumstance in evaluating the reasonableness of the taxing authority's assessment, holding that the tax authority might assess the property on the best information available. The Court furthermore noted that the General Assembly had recently passed Virginia Code § 58-769.3:2, authorizing tax assessors to require owners of income-producing property to submit such information or be barred from later introducing it in a tax correction case. In *Gordon*, however, the Court based its decision on the tax assessor's successful showing that it had requested income and expense information from the landowner without success. 224 Va. at 108-09. In this case, the County failed to show that a specific request had been mailed to, or received by, Seaone. Therefore, *Gordon* is not controlling. Nor does § 58.1-3294 provide a basis to bar Seaone's introduction of such information. While § 58.1-3294 allows assessors to require such income and expense information, nothing in the statute suggests that the statute may be applied to bar evidence in a tax

correction case in the absence of proof of receipt by the property owner of the assessor's demand for such information.

At trial, Green testified that such requests were sent to owners of income producing property, but he did not testify that such requests had specifically been sent to Seaone. Nor did he describe the County's system for sending out such notices with sufficient specificity so that this Court could infer that such a demand had reached Seaone. Under such circumstances, an erroneous assessment may be corrected (Va. Code § 58.1-3987 (Michie 1991)) despite the fact the assessors did not receive actual rent and expense information.

Fincham's deposition and appraisal were next received by the Court over the County's objection, after Reed had certified the suitability of Fincham's appraisal methodology as required by this Court in its order of August 6, 1993. Fincham testified that he had never met Seaone but that he had conducted an appraisal of the Center for the Horizon Bank. He testified that since the Center was an income-producing property, its value was determined by the income stream produced by its leases. (Fincham Dep., 19.) Based upon net rents of $580,984, he testified that it was his opinion, using the capitalization of income approach, that the Center's value was $5,281,700 as of February, 1992. (Fincham Dep., 26.) He further opined that there was no significant difference in the Center's value between January 1, 1992, and February, 1992.

Fincham further testified that he held no opinion with respect to the value of the Center for years other than 1992, but that he could discern no basis for the large differentials between the County's fair market values and the order of magnitude of the valuation figure he had reached for 1992. He testified that since the Center generated lower rentals in 1989 to 1991, he would anticipate that the values for the three preceding years should therefore have been lower than in 1992. (Fincham Dep., 42-43.)

In the course of Fincham's testimony, questions were posed with respect to the appropriateness of appraising the Center on the basis of economic rents, as opposed to actual rents, since the Center was subject to long-term, below-market leases. He opined that since the income stream determined the Center's value, use of economic rents would be inappropriate. (Fincham Dep., 31-34.) He further testified that a shopping center of the age and condition of the Center could not command the economic rent assumed by the County's appraisers, $9 per square foot, even if the Cen-

ter's long-term anchor leases were disregarded. (Fincham Dep., 30-31.) However, he also acknowledged that he was not familiar with how income-producing properties were appraised in Virginia for tax purposes. (Fincham Dep., 61-62.)

After the conclusion of Seaone's case-in-chief, the County moved to strike Seaone's evidence. This Court ruled that to successfully attack a tax assessment, the property owner had the burden of overcoming the presumption in favor of the County's assessments by showing either that the assessments were incorrect or that the tax authorities had ignored material facts in making them. *Smith v. Board of Supervisors*, 234 Va. 250, 257-58, 361 S.E.2d 351 (1987). Relying upon decisions of the Supreme Court of Virginia mandating that a taxing authority must consider actual rents, this Court found that Seaone had introduced persuasive evidence that the County had not considered actual rents in appraising the Center and in making its assessments for the years in question. The County could not have taken actual rents into consideration for the 1989 and 1990 tax years, because such information had not been obtained from Seaone. (*See* Pet. Exs. 7, 8; Def. Exs. 1, 2.) The County's motion to strike was accordingly denied, even though Seaone had presented no appraisal evidence as to the value of the Center for the 1989, 1990 and 1991 tax years.

The County then called only one witness in support of its case. Green testified that although he had not performed the appraisals which formed the basis for the County's assessments, he had nevertheless reviewed them. During his testimony, however, he did not explain how the County's appraisals had been conducted; and he did not explain the huge difference between the economic rents derived by the County for the 1989 and 1990 years.[5] Instead, testifying as an expert appraisal witness, Green attempted to justify the County's final assessments by his own *post hoc* appraisal, which he contended was based upon the Center's actual rents.

Green testified that in making his appraisal he employed the capitalization of income approach. (Tr., 219.) He began by identifying rents from "several [shopping] centers . . . that had been around for some time," which he deemed similar to the Center. (Tr., 220.) He determined that those rents had increased from four to six percent per year from the mid-

---

[5] Green at one point in his testimony did state that he believed that the cap rate used in 1989 may have been too high. For reasons which will be discussed later, the Court places little weight on his observation to that effect.

1970's until the years in question. (Tr., 221.) By applying similar compounding rates to rents charged by Seaone at the Center in the early 1970's, Green reached "a rental base" for the Center of $722,640. (Tr., 221.) He adjusted this figure for anticipated vacancies and added pass-throughs and percentage rents to this figure to arrive at effective potential income after vacancies of $846,118. (Tr., 223.) He then adjusted that cumulative rent figure for expenses (although he indicated some skepticism as to the accuracy of his expense figures) to arrive at a net rental figure, which he divided by a representative cap rate to arrive at a 1989 value of the Center of $8,147,070. (Tr., 235-36.) He noted that had he used the original cap rate used by the County's appraisers, he would have arrived at a value of $7.7 million. (Tr., 235-36.) He likewise reached values for the Center for 1990 to 1992, using the same procedure which he opined supported the County's assessments for those years. (Tr., 235-36.)

Green then testified that he had corroborated his appraised values for the Center by determining the rents for small store and anchor tenants at comparable shopping centers in 1989. He testified that rents for small store rents ranged between $17.24 and $24.54 per square foot; that they averaged $20.97 per square foot of space *after adjustments*; and that the County's 1989 appraisal reflected rent for small stores in the Center of between $12.75 and $13.75 per square foot *after adjustments*. (Tr., 237-241, 247.) Green opined that these comparisons showed that the County's values were "in the range." (Tr., 247.) Green testified that similar studies showed that, from 1990 to 1992, small store rents in comparable shopping centers again ranged from $17.25 to $24.54 per square foot; but that the County's appraisals for those years reflected rent for small stores of $19 per square foot. (Tr., 247-48.) Green did *not* explain how the Center's small store rents in 1989 could be $13.75 per square foot; how they could be $19 per square foot in 1990 (an increase of 46%); and yet how they could be sufficiently comparable with one another so as to corroborate the accuracy of the County's appraisals.

Green then testified that rents for anchor tenants (which he also characterized as "medium size to medium large" stores) in comparable centers ranged between $5.25 and $18.42 per square foot of space; that the 1989 appraisal reflected rent for anchor tenants in the Center of $18.24 per square foot; and that they averaged $9.14 per square foot. (Tr., 250.) He further testified that the County's 1989 appraisal reflected rent from the

Center's anchor tenants of $7.75 per square foot (A. & P. Lease) and $12.75 per square foot (Dart Drug Lease). (Tr., 252-253.) For the 1990 tax year, however, Mr. Green found that the Center anchor tenants' rent had not increased, as in the case of small stores.

The County's appraisers who had prepared the appraisals it used in support of its 1989, 1990, 1991, and 1992 assessments of the Center were not called to testify.

After Seaone provided brief rebuttal testimony from Lussi reiterating that the actual rental information contained in Petitioner's Exhibit 11 included "pass-through" rents, Seaone rested his case.

## III. *Decision*

### A. *Legal Principles Governing Tax Assessment Challenges*

The Virginia Constitution stipulates that real estate may be taxed by localities in accordance with requirements established by the General Assembly. Va. Const., Art. X, § 4. It further stipulates that tax assessments of real estate must be based upon the fair market value of real estate. Va. Const., Art. X, § 2.

In § 58.1-3984 of the Virginia Code, the General Assembly provided a mechanism by which aggrieved property owners might seek to rectify erroneous assessments. This provision expressly places a burden on the property owner to show that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application. Va. Code Ann. § 58.1-3984(A) (Supp. 1991). Seaone seeks relief under this statute. Since he does not contend that this is a "uniformity" case, he must show that his property was valued in excess of its fair market value.

In addressing Seaone's motion for judgment, moreover, this Court must be reluctant to readily override assessment decisions, lest it be converted into a super-assessment board. *Board of Supervisors v. Leasco Realty, Inc.,* 221 Va. 158, 267 S.E.2d 608 (1980). As the Supreme Court of Virginia explained in *Board of Supervisors v. Donatelli & Klein,* 228 Va. 620, 627, 325 S.E.2d 342 (1985):

> A clear presumption favors the validity of the assessment and can be rebutted only upon a showing of manifest error or total

disregard of controlling evidence. *Richmond v. Gordon*, 224 Va. 103, 110, 294 S.E.2d 846, 850 (1982); *Viscose Corp. v. Roanoke*, 205 Va. 192, 194-95, 135 S.E.2d 795, 797-98 (1964). Where the trial court finds such error to exist it may properly find the presumption rebutted and fix the fair market value in accordance with the evidence. Code § 58-1148, now § 58.1-3987 (Repl. Vol. 1994); *see Harrisonburg City v. Taubman*, 212 Va. 28, 30, 181 S.E.2d 654, 656 (1971).

In challenging the Board's methodology in assessing the Center for tax purposes, Seaone is faced with the presumption that the County's assessment was correct. Va. Code § 58.1-3984. To overcome this presumption, he must demonstrate that the Board's assessments were either manifestly erroneous or made in total disregard of controlling evidence. *Arlington County Board v. Ginsberg*, 228 Va. 633, 325 S.E.2d 348 (1985).

However, as this Court ruled with respect to the County's motion to strike Seaone's evidence, when a landowner demonstrates that a taxing authority has ignored actual or contract rents in favor of economic or market rents, the landowner has overcome the presumption in favor of the assessment. *Tysons Int'l*, 241 Va. at 6-7; *Smith*, 234 Va. at 258. At that point, the burden shifts to the taxing authority to demonstrate that the actual rent and expenses "do not fairly reflect economic net income" for the subject property. *Id.*

## B. *The County's Failure to Consider Actual Rents*

Based upon the evidence received in this action, this Court concludes that Seaone has sustained his burden of showing that the County did not take actual rents into account in appraising the Center for the 1989, 1990, 1991, and 1992 tax years. The evidence presented shows that the County appraisers did not have information as to actual rents for the 1989 and 1990 tax years and therefore could not have taken actual rents into account in making their appraisals. This circumstance is demonstrated by the County's own Field Data Cards. Furthermore, because those Field Data Cards also show that the 1991 and 1992 appraisals are based upon the County's 1990 economic rent figures, this court concludes that the County likewise failed to consider actual rents for the 1991 and 1992 tax years.

The County's failure to use actual rents is also shown by the economic rents assumed for the 1991 and 1992 tax years. In those years, the County had actual rent information for the Center. The actual rents for the Center substantially decreased between 1991 and 1992 and yet the economic rents for the property remained unchanged.

Seaone also sustained his burden of showing that the County's assessments for 1990, 1991 and 1992 were erroneous. The County's 1990 appraisal for the Center was 43% higher than the appraisal for the previous year, an increase from $6,958,595 to $9,976,635. The evidence introduced at trial showed that this jump occurred on account of the County's assumption that economic rents jumped by 43% between 1989 and 1990[6] despite the facts that (1) commercial real estate in the region was suffering an unprecedented decline; and (2) the County had no actual rent and expense information for the two years involved. Furthermore, Lussi testified that rents at the Center were approximately the same in 1989, 1990, and 1991.

In accordance with *Smith* and this Court's denial of the County's motion to strike at the close of Seaone's evidence, this Court finds that Seaone has sustained his burden of overcoming the presumption in favor of the County's assessments. *Smith*, 234 Va. at 258.

## C. *The County's Evidence*

After the denial of its motion to strike, the County attempted to prove that its assessments were correct. In doing so, however, the County failed to present testimony by the appraisers who actually valued the Center for the years in question. Nor did the County present evidence rebutting Lussi's testimony that actual rents remained constant from 1989 to 1991. Instead, it called the Assistant Director of its Real Estate Department, Assessments Office, Green, who attempted to justify the County's assessments on the basis of his *post hoc* appraisal prepared for purposes of trial.

---

[6] The County's Field Data Cards reflect that the County's appraiser assumed 1989 small store rents of approximately $13.75 per square foot of leasable space and 1989 anchor store rents of approximately $7 per square foot of leasable space. (Pet. Exs. 1-4; Def. Exs. 7-10.) The same records reflect that for the following tax year, 1990, the County's appraisers assumed small store and anchor store rents of approximately $19 per square foot and approximately $10 per square foot of leasable space, respectively. The Field Data Cards therefore show approximate jumps of 38% in small store rents and 30% in anchor tenant store rents.

The Court carefully listened to Green's testimony and studied the transcript of that testimony. His *post hoc* appraisal testimony appeared to be advanced to address the obvious shortcoming of the County's assessments: that actual rents had not been used by the County arriving at the assessments made against the Center. This Court found Green's testimony generally to be both contrived and unpersuasive.

Green testified at length as to an appraisal methodology which was not itself based on the actual rents *for the years in question*. Instead, his appraisal was based on historic Center rents which were compounded to obtain a hypothetical figure for the economic rents for the years in question. The Center rates were compounded at a rate of four to six percent per year, the rates of increase for rents at other Fairfax County shopping centers. Green assumed that the increase of rents in the supposedly comparable shopping centers would mirror what could be expected to occur with respect to market or economic rents at the Center. This approach patently depends upon the comparability of the Center with the other shopping centers over the entire decade and a half during which rents were compounded. However, Green's testimony as to comparability was unconvincing. In particular, he did not know whether the owners of the comparable centers had invested substantial monies in capital improvements to increase rents at those centers.

The persuasiveness of Green's testimony was further undermined by his constant adjustments of comparables to the subject property. He seldom presented the Court with an explanation of why, or more importantly, how these adjustments were made. This circumstance affects the weight this Court accorded Green's testimony.

The weight of Green's testimony was further diminished by other questionable opinions. For example, in support of his comparability arguments, Green opined that the small store and anchor store rents at the Center for the years in question fell within a range of such rents at other centers. It was apparent that the types of stores deemed comparable produced so great a spectrum of rents that it would have been remarkable if the Center rents had not fallen in the range presented. For instance, for the 1989 tax year, the rents for anchor stores ranged from $5.25 to $18.42 per square foot of leasable space. Since the A. & P. and Dart Drug rents were $7.75 and $12.75 per square foot, respectively, they easily fell within Green's wide range.

For the reasons set forth above, the Court finds that the County failed to prove that it had used actual rents in making its assessments or that its assessments were otherwise accurate.

## D. *Correction of the Assessments*

Section 58.1-3987 of the Code authorizes a circuit court to correct an assessment in the event a taxing authority has erroneously assessed real estate. In granting such relief, the court does not have authority to remand the case to the taxing authorities for a new assessment but must "grant appropriate relief based upon the evidence before it." *Smith*, 234 Va. at 255.

The question presented by this case is whether the evidentiary record is sufficient for this Court to correct the County assessments. Seaone contends that the testimony of Fincham and Lussi constitutes such evidence. This Court cannot agree.

Fincham's testimony related only to the value of the property in one year, 1992. Furthermore, he pointedly testified that his appraisal of the property was a leased fee appraisal, i.e., the value of the property was the function of the existing income stream generated by actual leases. While that appraisal may have been wholly appropriate for the purposes of Fincham's appraisal for his bank client, the Supreme Court has emphasized that real estate assessments must take the full fee simple value of real property into account, not merely the value of the real estate as determined by existing leases which might or might not reflect the fee simple value of the property. *Richmond, F. & P. RR. v. Commonwealth*, 203 Va. 294, 301, 203 S.E.2d 206 (1962). Accordingly, Fincham's opinion testimony as to value does not constitute a basis for correcting the County's assessments either alone or in combination with other evidence introduced.

Lussi's testimony did advance his opinions, which, if accepted by the Court, would present an appropriate basis to correct the County's assessment. However, as indicated above, Lussi's testimony simply was not persuasive. Neither his credentials nor his actual testimony merit the adoption of his opinions of economic rent values by this Court.

In the final analysis, this Court reluctantly concludes that it is unable to afford Seaone relief. Neither the Code of Virginia, nor any precedent presented by the parties, suggests that this Court is authorized to assess the value of the Center on any basis other than the evidence presented at trial.

Since I find Seaone's evidence insufficient to correct the County's assessments, he has failed to sustain his ultimate burden of proof. The relief he seeks therefore must be denied.