## CIRCUIT COURT OF GOOCHLAND COUNTY

West Creek Associates, L.L.C.

v.

Goochland County

March 9, 2007

Case No. L-04-083

By Judge Timothy K. Sanner

The court is in session today to rule upon the multiple applications by the West Creek plaintiffs seeking relief from assessments they allege are erroneous pursuant to Virginia Code § 58.1-3984.

The Court has taken several days since the end of the trial to carefully review the evidence. The Court has also carefully reviewed the well-written closing briefs of the parties, which have helped frame the issues and guided the Court in the application of the facts as the Court has found them to the applicable law.

This case began when the plaintiffs chose to purchase approximately 2500 acres of land commonly known as the West Creek Business Park from Bank of America Trust, which at that time was comprised of twenty parcels of land, doing so by way of 144 deeds. The parcels were shown in a document that has been generally referred to as the Timmons sketch. Cheryle Toy, who was sometimes described as a paralegal for the plaintiffs, was the chief architect of this drawing which was created to obtain long-term capital gains treatment.

Even before the date of the closing on June 30, 2000, it was clear that the plaintiffs' taking title in this fashion would result in controversy. At a May 2000 meeting, the plaintiffs made it clear that they saw the West Creek

Business Park as one tract of land held for development purposes and that, if it were assessed at the figure greater than the purchase price, they would sue. Representatives for the County and the Commonwealth of Virginia made it clear that taking title in this fashion would create 144 separate parcels that would have to be assessed individually. It is clear that the law of Virginia does require an individual assessment of all of the parcels in question.

The parcels created are of a unique character. They are not legally subdivided, yet they exist as individual parcels. Yet legally they are clearly more than simply components of a greater whole. The difference in how the parties regard these parcels has shaped the presentation of the evidence, affected the determination of value, and created a conflict regarding the applicable law.

A fundamental disagreement exists between the parties regarding the standard of review that the Court has to apply to the actions of these authorities involved in the assessment process. Some principles are agreed upon. All assessments of real property shall be at their fair market value; under Virginia Code § 58.1-3984, the taxpayer is entitled to relief if he can show that the property in question is valued at more than fair market value, or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal.

The parties agree that the assessment is presumed to be correct and must be overcome by a clear preponderance of the evidence. The parties also seem to agree that this presumption of correctness must be overcome by showing that the taxing authority either committed manifest error or totally disregarded controlling evidence.

The parties disagree how this can be done. West Creek citing the *Board of Supervisors of Fairfax County v. Telecommunication Industries*, 246 Va. 472 (1993), a case dealing with fungible items of personal property, contends that evidence that property was assessed at greater than fair market value is sufficient to support a finding of manifest error. The County, citing a number of cases, contends that the showing that manifest error took place, or that controlling evidence was disregarded, requires proof of what information the assessing authority had, how that evidence was considered and weighed, and ultimately what was the basis for their decision.

The Court has carefully considered this important initial issue. The Court noted at that the motion to strike stage cases such as *City of Norfolk v. Snyder*, 161 Va. 288 (1933); *City of Richmond v. Gordon*, 224 Va. 103 (1982); *Board of Supervisors of Fairfax County v. Leasco Realty*, 221 Va. 158 (1980); and *Orchard Glen East, Inc. v. Board of Supervisors of Prince William County*, 254 Va. 307 (1997), had stressed the clear presumption in

favor of the validity of the assessment. Trial courts have been admonished to be hesitant within reasonable bounds to set aside the judgment of assessors, otherwise the trial court will become a board of assessment, thereby arrogating to itself the function of a duly constituted tax authority.

The Court concludes that the County's position is correct on this issue. The admonition just set forth by the Court weighs against finding error simply by hearing differences in value without knowing more about how the assessed values were arrived at and thereby finding that error was committed by these taxing authorities. More importantly, in the *City of Norfolk v. Snyder, supra*, the Virginia Supreme Court, quoting first from *Charleston & Southern Bridge Co. v. Kanawha County Court*, 41 W. Va. 658, and later *Cooley on Taxation*, held as follows: "If assessments are to be based upon the opinion of individuals instead of being uniform and bearing equally upon the property of the same character, the assessment could be as shifting and variable as the opinion of man influenced oftentimes by local causes could possibly make them." Further, conclusions of the Board of Commissioners will not be disturbed unless it appears that there has been a manifest error in the manner of making the estimate or that evidence which should be controlling has been disregarded.

In this Court's view, this requires the Court to determine what evidence the Board of Assessors considered in arriving at the assessments and how they got to their conclusions. Additionally, as the County pointed out in its brief, the focus needs to be kept on the actions of the taxing authority, as recently held in *Keswick Club, L.P. v. County of Albemarle*, [273 Va. 128 (2007)], a January 12, 2007, decision of the Virginia Supreme Court.

This Court had previously found at the motion to strike phase that Steve Wampler, the County's appraiser, had committed manifest error by simply taking what he described as an average value of the West Creek parcels and then spreading it across the West Creek parcels. Doing so without that $75,000 figure being applicable to any particular parcel is still manifest error in the Court's view. However, that was the appraiser's error. At the motion to strike stage, taking the evidence and all the reasonable inferences in the light most favorable to the plaintiffs, the Court was able to infer that error was traceable to the actions of the Board of Assessors and the Board of Equalization as to the Phase I and Phase III parcels. Now, however, a different standard applies and the plaintiffs must prove by a clear preponderance that the Board of Assessors or the Board of Equalization committed manifest error or totally disregarded controlling evidence.

Unfortunately for the plaintiffs, the evidence regarding what these boards considered and how they arrived at their decisions is nearly nonexistent. Any order admitted provides little information beyond the

property description and the assessed value. There is no record from any of the hearings or any deliberations. There is no explanation letter from a board detailing its reasoning with respect to the subject parcels, although there is such a letter written to another landowner not involved in these cases suggesting it could have been obtained.

The Court heard from George Alvis, Jr., John Payne, and James Yancey of the Board of Assessors. While all of these gentlemen were credible, they were all also elderly and had little recall of events of five to six years in the past. They gave the Court no insight into their evaluations and decision process other than they tried to be fair and do their best.

The same was equally true of David Parrish, who testified *ore tenus*, and the deposition of Floyd Callahan. Mr. Parrish significantly indicated that Knight Bowles, a member of the Board of Equalization, was asked to go out and investigate and his report was considered. However, Mr. Parrish had no details as to the procedure other than they tried to be fair.

As to Floyd Callahan, who was eighty at the time of the deposition, he was at a disadvantage that resulted from his being required to resign due to health reasons from the Board of Equalization at some point during the West Creek presentation, which he appeared to recall little of, and apparently prior to their final deliberations, at least by his account.

The best evidence that the Board of Assessors considered other evidence and was influenced by factors other than the Wampler appraisal is their assessment of the Phase II parcels at $35,000 per acre, there being no evidence that Wampler gave the Board any comparables that would support that assessment. In fact, Wampler, whom the Court finds to be credible even if it questions the manner of his appraisal, testified that the Board of Assessors had his comparable sales, met at times when he was not present, and had information that he did not see regarding the assessments, most notably information about Capital One. Wampler testified he did not know why the Board assessed land as it did. Unfortunately for the plaintiffs, neither does the Court. Consequently the plaintiffs have not proved by a clear preponderance that the Board of Assessors committed manifest error or disregarded controlling evidence.

The same is equally true of the Board of Equalization. Other than reasonably inferring that the road parcels, where even the plaintiffs had described as paper roads, should be equalized to the surrounding property value, which the Court cannot say is error, there is nothing further about the evidence before it or its proceedings that proves by a clear preponderance that the Board of Equalization committed manifest error or disregarded controlling evidence.

While these findings are such that the Court would be required to dismiss these applications, the Court, in the event it is determined it has applied the incorrect standard of review, will analyze the evidence under the standard proposed by the plaintiffs. Under this standard of review, the Court could find the manifest error in the assessments where the disparity between the fair market value and the assessed value is substantial.

In *Telecommunications Industries*, the trial court found that the taxpayer had rebutted the presumption of correctness of the assessors and its evidence of value was not contradicted nor refuted by any competent evidence. From this, the Court infers that the trial court had to find that Telecommunications Industries' evidence of value was initially more competent and compelling than the values set forth in the assessments. An initial difficulty this Court has is the manner of values arrived at by the plaintiffs.

The Court finds that Messrs. Goodwin and Armstrong are intelligent and successful businessmen. They no doubt know a great deal more than this Court and likely anyone else in this courtroom about how to buy and develop property. They no doubt have been successful by exercising their judgment to recognize good purchase opportunities and the potential for profits. It appeared to the Court that their acquisition of the West Creek Business Park afforded such an opportunity. While the Court does not doubt that the Bank of America properly exercised its fiduciary duty, the plaintiffs were able to negotiate a bulk sale of this property for cash at a price $5 million lower than that initially sought by the Bank of America. There has been no doubt advantage to the Bank of America in selling all of their West Creek interests in one fell swoop for cash that justified the reduction in the selling price and no doubt that the plaintiffs benefited from the bargain as well.

It is plain that the plaintiffs see this as one large development and have valued it as such. Unfortunately for them, however, the West Creek property is not one large parcel, nor has it ever been during the course of this case. It was previously twenty parcels, and, as of the valuation date, it was 144 parcels. The County was required to assess each parcel, not assess the development. While the lines on the Timmons sketch may not have meant anything more than the capital gains tax plan for the plaintiffs, it defined the property the County had to assess. The evidence of the owners truly does nothing more than spread the value of the development across the individual parcels, and the Court does not find that valuation method to be persuasive.

The plaintiffs purchased a tract of land totaling over 2500 acres and now want to allocate that value to individual parcels, which are only a small percentage of the size of the overall development. The Court is entitled to use

its common sense and, in doing so, recognizes that an economy of scale is being ignored by the plaintiffs. By analogy, if a developer purchased a 100-acre tract which was divided into 100 one-acre parcels, even with limitations related to access, water, sewer, and subdivision approval, the Court would expect the value of each lot to be more than one percent of the total. Even Mr. Goodwin testified that the rule of thumb was the larger the parcel, the cheaper the price should be. In this case, the difference in size of the parcels to be compared is usually not only two times as large, or ten times as large, but approximately 100 times as large.

In essence, the plaintiffs used the overall development as its comparable. The folly in doing so could not be better stated by the Court than did Joseph Call in his testimony at page 1007 of the transcript, from which the Court will read at this time. Quoting Mr. Call:

> First off, the sale in excess of 2,000 acres had a totally different highest and best use as concluded for each of the 144 units.
>
> Secondly, the sale would appear – the large sale would appear to appeal to a different type of purchaser than any anticipated purchasers of lots in Phase I, II, or III.
>
> Thirdly, a comparison of – in excess of a 2,000-acre parcel with a smaller of seven to twenty-five acres is just ludicrous. Comparisons in that instance are odious.
>
> The only comparability with regard to the over 2,000-acre sale of the West Creek project is the fact that it is proximate and timely, but in no way is it physically similar. No way does it offer the same economies. I do not think a size adjustment is possible. Relying on that sale as an independent indicator of value for any of the 144 parcels would produce an appraisal report that would lack total credibility. The use of that sale and that sale alone as an indication of value would be grounds for possible dismissal from the Appraisal Institute and probably revocation of one's appraisal license.

Consequently, the Court places no confidence in the use of value of the development as a comparable sale. This is equally true of the testimony of the plaintiff's expert Michael Miller. First, the Court finds the professional criticism of Mr. Miller's work by William Harvey to be entirely valid. These criticisms were hardly necessary, however. Beyond the Court's concern regarding use of the development as a comparable sale, the Court found it difficult to accept that any kind of independent appraisal was conducted by

Mr. Miller when it matched the testimony of Mr. Goodwin, except for the waste parcels, to the penny. I am not sure this Court has ever seen an appraisal that ever tried to fix a value on a property to the penny on a per-acre basis, which would normally connote a precision that could not be properly claimed. The County has also argued that Mr. Miller's process in acquiring information as he developed his opinions regarding value suggest that he made his mind up before he started, and that to the Court is a fair comment.

Additionally, the plaintiff's opinions as to value flies in the face of the evidence that land in the West Creek Business Park was selling at prices ranging from $43,000 per acre to $120,000 per acre. All of these factors do not lead the Court to conclude that the evidence of the plaintiff is sufficiently persuasive to convince the Court that their values are more persuasive than those arrived at by the tax authorities. Furthermore, unlike *Tele-communications Industries*, the values of the plaintiffs were contradicted or refuted by competent evidence.

The most compelling witness in the Court's view regarding establishing value for the parcels in question was Mr. Call. This process involved the detailed evaluation of each parcel with appropriate adjustments that the Court would expect to see conducted. The Court found his methods and comparable sales to be persuasive. The Court is mindful that the plaintiffs dispute that he made sufficient adjustments, if any at all, for factors such as lack of subdivision approval, access, and availability of water and sewer. The Court agrees that there are differences in many of the parcels, particularly those outside of Phase I and the Capital One property. The Court agrees, however, with Mr. Call that an appraiser could consider those factors which are reasonably proximate in the future, and the evidence suggested that subdivision approval could reasonably be obtained if Goochland County was dedicated to business growth in the West Creek Business Park by making water and sewer available.

Finding Mr. Call's valuation testimony to be the most compelling, the Court also finds that it supports the assessments in question and contradicts and refutes the evidence of the plaintiff, which the Court has rejected for the reasons previously stated.

Therefore, the Court dismisses the plaintiff's applications. The Court will note the exceptions of the plaintiff.