Richmond

BOARD OF SUPERVISORS OF FAIRFAX COUNTY, ET AL.

v.

LEASCO REALTY, INC.

June 6, 1980.

Record No. 780914.

Present: All the Justices.

*Jack L. Gould, Assistant County Attorney (Frederic Lee Ruck, County Attorney,* on brief), for appellants.
*C. P. Montgomery, Jr.,* for appellee.

COMPTON, J., delivered the opinion of the Court.

This appeal stems from a proceeding filed under Code § 58-1145 to correct an alleged erroneous assessment of real estate. We review the trial court's action in granting the taxpayer relief by reducing the assessed value of the subject property.

Article X, § 1, of the Constitution of Virginia provides that all taxes shall be uniform upon the 'same class of subjects within the

territorial limits of the authority levying the tax. Article X, § 2, of the Constitution requires all assessments of real estate to be at fair market value. Code § 58-1145 provides that a taxpayer applying to a circuit court for relief from an allegedly erroneous assessment shall have the burden of proving that the subject property is assessed at more than fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal.

The dispositive question in this appeal is whether the trial court erred in finding a lack of uniformity under the circumstances of this case.

On December 31, 1975, appellee Leasco Realty, Inc., the taxpayer, filed its application asking the trial court to correct erroneous assessments on its Fairfax County property for the 1973, 1974 and 1975 tax years. Named as defendants were appellants Board of Supervisors of Fairfax County and Samuel A. Patteson, Jr., Supervisor of Assessments (hereinafter collectively referred to as the County). Following a February 1978 hearing, the court below found the assessments were not uniform in application and declared them erroneous. It ordered the assessments lowered and required the County to refund taxes erroneously charged and paid for the years in question. We awarded the County an appeal from the March 1978 final judgment.

In 1968, Leasco purchased a parcel of land containing approximately 98 acres in the Tysons Corner area of Fairfax County for $7.75 million or $1.81 per square foot. The parcel abutted a 116-acre tract known as the Lerner/Ammerman property. Leasco intended to effect a headquarters consolidation of its parent corporation's four subsidiaries, which engaged in "library services work for the government" and performed "computer services." After the parent suffered financial reversals in 1969 and 1970, Leasco decided to sell the tract either in its entirety or by subdividing.

In 1971, the County reassessed the real estate in the Tysons Corner area. The 1971 assessment significantly increased the appraised value of the Leasco and Lerner/Ammerman tracts, both of which were undeveloped at the time. The record shows that Leasco's purchase at $1.81 per square foot materially influenced the 1971 values assigned to both tracts.

Because of certain sales and dedications of land, Leasco's parcel diminished in size during the relevant period. In 1973, the approximately 83 acres owned by the taxpayer were appraised at $1.90 per square foot. In 1974, the approximately 75 acres owned by Leasco

were appraised at the same price per square foot. In those two years the Lerner/Ammerman property was appraised at $1.84 per square foot. In 1975, the approximately 44 acres owned by Leasco were appraised at $2.00 per square foot.

After the 1971 assessment, the owners of the Lerner/Ammerman tract filed suit in the court below contesting the correctness of the appraisal as to that property, contending the assessments assigned to the land exceeded fair market value. That litigation concluded in 1975. As a result, the trial court, Honorable Lewis D. Morris presiding, reduced the assessments for the Lerner/Ammerman property from $1.84 per square foot to $1.22 per square foot for 1972 and 1973 and to $1.11 per square foot for 1974. The County did not appeal that decision.

During the 1978 hearing of the present suit filed in 1975, Leasco presented the testimony of John B. Piper, a private consultant and real estate appraiser. Piper had testified for the County in the Lerner/Ammerman litigation.

In the present suit, Piper testified he had investigated the real estate market in the Tysons Corner area and examined the County's assessment records to determine the market value of the Leasco property and to ascertain how that market value related to the value of similar properties. He studied the assessment history of sales of land similar to the Leasco property occurring from 1970 through 1977. Piper equated the sales prices of those comparables to the appraised values of the comparables used by the County assessor, and developed a "sales assessment ratio." For the 1971-1977 period, Piper made almost 40 "observations" relating to nine parcels of unimproved land, including the Leasco property, and determined that in about 30 instances, the appraised value fixed by the County was from 20 to 30 percent below the most recent sales price for the parcel of land. Piper stated that in four instances, however, all involving the Leasco tract, the appraised value was more than the most recent sales price. Piper then employed his sales assessment ratio to determine the appraised value of the Leasco property, and this valuation was ultimately adopted by the trial court.

The following tables summarize data relevant to the case.

### Leasco Property

| Tax Year | Appraised Value (sq. ft.) | Value Fixed by Court (sq. ft.) | Acres | Refund |
|---|---|---|---|---|
| 1973 | $1.90 | $1.35 | 83.9799 | $35,330.50 |
| 1974 | $1.90 | $1.30 | 75.6890 | $33,154.75 |
| 1975 | $2.00 | $1.25 | 44.2289 | $22,252.36 |
| | | TOTAL REFUND | | $90,737.61 |

### Lerner/Ammerman Property

| Tax Year | Appraised Value (sq. ft.) | Value Fixed by Court (sq. ft.) |
|---|---|---|
| 1972 | $1.84 | $1.22 |
| 1973 | $1.84 | $1.22 |
| 1974 | $1.84 | $1.11 |

Piper admitted he did not know the methodology used by the County tax assessor in arriving at fair market value for the properties within the county. He agreed, however, the assessor had "a systematic approach to the problem of reaching fair market value," and that the appraisals had been "consistently below the most recent sales price[s]" except, in Piper's opinion, with respect to the Leasco property.

Testifying for the County were Patteson, the Supervisor of Assessments, and several of his staff appraisers. The County's evidence disclosed that it followed a "continuous maintenance" or "continuous equalization" or "hot spotting" system to assure that its assessments accurately reflected current market values of land. The system was based on a study of bona fide, "arm's length" sales. A sales assessment ratio was "derived from dividing the sales price into the assessment." The resulting ratios would then be applied in every part of the county to determine whether the assessments in a particular area of the county were high, low, or "on line." To assure periodic examination of property in areas with few sales, the County was divided into three geographical sections and every property in a section was "looked at" once during each three-year period.

The County's evidence further showed that Leasco's property was appraised using the same appraisal methods employed throughout the county. The recent sales in the area were identified and analyzed according to, for example, property size and shape, location, road

access, zoning, situs of sewer trunk lines, County master plans, improvements and highway frontage. Physical inspections of the property were conducted, and personal contacts were made to determine details of sales contracts and price negotiations. When sales data on specific "other" property was unavailable, an "evaluation process" was used in which values were assigned to "benchmark" property, which had the "strongest" and most current sales information. Then the characteristics of the "other" land would be related to the "benchmark" land to arrive at the appraised value of the "other" property.

The County's evidence showed that direct comparison between the Leasco and Lerner/Ammerman properties was prevented because the properties were zoned differently, were of different sizes, had different topography, and had different access to streets and sewer. But Piper was of the opinion that, except for zoning, the two properties were "closely comparable." In addition, Leasco showed on rebuttal that during the Lerner/Ammerman trial, a county appraiser had testified that the Lerner/Ammerman property, adjacent to Route 123 (Chain Bridge Road), would be "superior" to property such as Leasco's which was along Route 7 (Leesburg Pike).

In holding the County had violated the constitutional provision mandating uniformity of assessment, the trial judge made the following comments from the bench which are representative of the reasoning employed by the court below during the oral opinion:

> Still in looking at uniformity I have to look at the immediate vicinity of this piece of property, the capabilities of each one, the zoning and so forth in arriving at a decision. Now, there is on the Lerner-Ammerman tract an appraisal even though it may be by the Court; but does not the Court have to consider that as a part of the uniformity existing in this area?
>
> If I have a house, you have a house that [is] identical. You go to Court. You get your assessment lowered. Now the fact that you got yours lowered creates a lack of uniformity then between your house and my house regardless of the reasons, but there is a lack of uniformity; is there not?

The trial judge further stated that the unappealed Lerner/Ammerman decision, in effect, established the fair market value for that tract and that such valuation should be considered along with "other comparables" used by the respective parties in this case. The court said the Lerner/Ammerman decision had "a great impact" on the Leasco property and that the court was "giving great weight to that Lerner-

Ammerman piece, frankly." The court, in conclusion, adopted the adjustments recommended by Piper and reduced the assessments by the amounts set forth in the foregoing table.

On appeal, the County argues the trial court "erroneously decided a uniformity question by applying fair market value standards." Emphasizing this is a "uniformity" case and not a "fair market value" case, the County contends that "uniformity of assessments is determined by analysis of the method of assessment used by the tax assessor, rather than by a comparison of the assessment of one property to that of another."

Pointing to the taxpayer's burden of proof, the County says the trial court's function in tax assessment cases is not to determine the value of the subject property, but it must decide whether the taxpayer has clearly shown that the assessment is excessive; this is only accomplished, the County argues, "by showing that there has been a manifest error in the manner of making the assessment." The County urges that a taxpayer has no legitimate basis to complain merely because the assessor has undervalued the parcel of another property owner. Rather, it argues, the taxpayer must show "the method of appraisal and assessment utilized generally was not applied to him." And it notes the undisputed evidence adduced at trial showed "the method of assessment used was applied uniformly to the Leasco property."

Citing the separate constitutional provisions relating to uniformity and fair market value, *supra,* the County argues these two distinct criteria govern assessment of property in Virginia and must be applied separately. The County says that Leasco argues, in effect, that "there is but one standard governing assessments: an amalgam of uniformity and fair market value, with the latter the predominant ingredient." The County contends that Leasco's argument blurs the distinction between uniformity and fair market value thus altering the "dichotomy" developed in Article X of the Constitution of two separate and distinct standards.

Quoting excerpts from the trial judge's oral opinion, the County argues the court below "erroneously relied almost exclusively on the value placed on the Lerner/Ammerman property in deciding that the Leasco assessments were not uniform." It urges that a "determination of uniformity or lack thereof ought not rest on whether the assessment in question is congruent with that of another parcel." The County contends the trial court effectively ignored testimony of the County assessors as to the method of assessment used and its consistent application.

Leasco argues the trial court correctly decided that uniformity re-

quires more than a determination whether the County applied the same method of appraisal to Leasco's property that was applied generally in the county. Citing cases, Leasco says decisions of this Court construing the uniformity standard demonstrate that a comparison of the contested valuation with valuations of similar surrounding properties is an appropriate method of determining uniformity and that the "requirement of uniformity in essence demands [such] comparison[s]." Leasco argues that if a disparity exists between property of like nature and classification, the uniformity requirement necessitates equalization.

Leasco further contends that under familiar principles we are bound by the trial court's findings of fact because the testimony of the County's assessors was "seriously impeached by the assessment history with respect to the Lerner/Ammerman and Leasco properties and by the evidence presented in the trial." And, finally, Leasco argues that Piper's study report, received in evidence as an exhibit, considered with his testimony was "the only coherent explanation for a situation in which the Leasco and Lerner/Ammerman properties were obviously not uniform in assessment."

Although we do not embrace all of the County's contentions, we are of opinion that the trial court erred in reducing Leasco's assessments.

■ Under Code § 58-1145, as pertinent to this appeal, the taxpayer has the burden to show "that the assessment is not uniform in its application." The word "assessment" in this context refers to "the determination of the value of the property," *Transcontinental Gas Pipe Line Corp.* v. *Prince William County,* 210 Va. 550, 554, 172 S.E.2d 757, 761 (1970), and not to the dollar amount in taxes the individual is supposed to pay. *Hoffman* v. *County of Augusta,* 206 Va. 799, 801, 146 S.E.2d 249, 250 (1966).

We have repeatedly said that in a proceeding under Code § 58-1145, and its predecessors, there is a clear presumption in favor of the validity of the assessment. *American Viscose Corp.* v. *City of Roanoke,* 205 Va. 192, 195, 135 S.E.2d 795, 797-98 (1964). Unless it plainly appears that some rule of uniformity has been departed from, the assessment will stand. *City of Roanoke* v. *Williams,* 161 Va. 351, 354, 170 S.E. 726, 728 (1933). The applicant must show manifest error. *City of Norfolk* v. *Snyder,* 161 Va. 288, 293, 170 S.E. 721, 723 (1933).

Moreover, courts should be reluctant, within reasonable bounds, to override the judgment of assessors lest they be converted into boards of assessment thereby arrogating to themselves the function of the duly constituted tax authorities. *Richmond, Fredericksburg and Potomac*

*Railroad* v. *State Corporation Commission,* 219 Va. 301, 313, 247 S.E.2d 408, 415 (1978). Inequalities of valuation are inevitable; the disparity must be striking before relief will be granted. *Washington County National Bank* v. *Washington County,* 176 Va. 216, 222, 10 S.E.2d 515, 518 (1940).

■ Against the foregoing procedural background, we turn to the substantive question of uniformity, its meaning, and its interplay with the concept of fair market value. The idea carried forward into our Constitution that taxes must be uniform seems to have developed from "a general sense of justice in the equal distribution of the public burden" and from "the principle that those who are similarly situated should be treated in a like manner by the law." 2 A. Howard, *Commentaries on the Constitution of Virginia* 1037 (1974). *See Washington County National Bank* v. *Washington County,* 176 Va. at 218, 10 S.E.2d at 516. Contrary to the County's position, considerations of uniformity should not be divorced from the concept of fair market value; the two constitutional principles must be read and construed together. But if it is impractical or impossible to enforce both the standard of true value and the standard of uniformity, the latter provision is to be preferred as the just and ultimate end to be attained. *Smith* v. *City of Covington,* 205 Va. 104, 108, 135 S.E.2d 220, 222-23 (1964).

■ Even though value is always important in questions dealing with real estate taxes, uniformity should not be "irrevocably tried to value." Matthews, *The Function of Constitutional Provisions Requiring Uniformity in Taxation,* 38 Ky. L. J. 503, 516 (1950). Consequently, when the taxpayer attacks an assessment alleging nonuniformity and there is no showing that disparate or unlawful methods have been employed in the appraisal process, it is not sufficient to show the valuation is excessive as compared with another valuation of like property; it must plainly appear that the appraisal upon which the assessment was made is out of line generally with appraisals of other neighborhood properties, which in character and use bear some relation to that of the taxpayer. *Washington County National Bank* v. *Washington County,* 176 Va. at 218, 10 S.E.2d at 516; *City of Roanoke* v. *Gibson,* 161 Va. 342, 347, 170 S.E. 723, 725 (1933).

■ Here, Leasco failed to sustain its burden to prove lack of uniformity. The evidence is undisputed that the County's appraisal-assessment technique was lawful, was employed throughout the county, and was applied uniformly to the subject property. Against this clear evidence, the taxpayer offered an expert who merely disagreed with the results of the County's assessment methods. Even if Piper's con-

clusions were to be accepted totally, the assessments are nevertheless not rendered invalid; uniform operation of law does not mandate uniformity of results.

The taxpayer as well as the trial court placed heavy reliance upon the court-ordered valuations on the Lerner/Ammerman property. The County's evidence, disputed by Leasco, demonstrated significant differences between the two tracts as to zoning, size, topography, and access. Nevertheless, even if we assume, as Piper opined, the two properties were "closely comparable," mere proof of disparity in valuation of one adjacent property will not sustain a claim of nonuniformity. When, as here, the attack does not focus on a claim that the subject property is assessed at more than fair market value and when, as here, it does not appear, using evenhanded, lawful techniques, that the subject assessment is unreasonably or arbitrarily disproportionate to assessed valuation of similar properties throughout the county, the assessment does not violate the constitutional mandate of uniformity. *See Perkins* v. *County of Albemarle,* 214 Va. 416, 418-19, 200 S.E.2d 566, 568-69 (1973); *see generally* Note, *Inequality in Property Tax Assessments: New Cures For An Old Ill,* 75 Harv. L. Rev. 1374, 1381-82, 1390-92 (1962).

■ Finally, we reject Leasco's contention that the trial court's ruling must stand because the County's witnesses were "seriously impeached" and because Piper presented the only "coherent explanation" for the disparity in values between the two adjacent tracts. As we have just said, the evidence bearing on the relevant standards of uniformity was uncontradicted. This is not a case which turns on the decision of disputed facts or credibility of witnesses but one which involves misapplication by the taxpayer of uniformity principles.

For these reasons, the judgment below will be reversed and final judgment will be entered here dismissing the taxpayer's application.

*Reversed and final judgment.*