## CIRCUIT COURT OF FAIRFAX COUNTY

Britt, L.P., et al.

v.

Fairfax County
Board of Supervisors

July 28, 1997

Case No. (Law) 128702

By JUDGE JANE MARUM ROUSH

This matter came on for trial without a jury on March 10, 11, and 12, 1997. At the conclusion of trial, the Court took the case under advisement. The Court has now had the opportunity carefully to consider the testimony of the witnesses, the exhibits, the pleadings, the stipulations of the parties, the briefs, and the argument of counsel.

Plaintiffs Britt, L.P., and Hallmark Renaissance, L.P. (collectively, the "taxpayers") brought this action against the Board of Supervisors of Fairfax County (the "County") to correct allegedly erroneous assessments of certain real property located in Fairfax County owned successively by Hallmark (in 1991) and Britt (in 1992) known as the Hallmark Building (the "Subject Property"). Hallmark seeks a reduction in the 1991 assessment and a refund of real estate taxes paid for 1991, and Britt seeks similar relief for 1992. For the reasons stated below, the Court finds that there was no manifest error in the County's assessment of the Subject Property in 1991. The Court finds that the County committed manifest error in its assessment of the Subject Property in 1992 and orders that the assessment be corrected to $16,000,000.00 and an appropriate refund be made pursuant to Va. Code Ann. § 58.1-3987. Interest shall be awarded on any amounts overpaid by the taxpayers before April 7, 1992, until paid.

Under Va. Code §§ 58.1-3987 and 58.1-3991, the Court may award interest on any refunds of taxes if the locality has adopted enabling legislation providing for interest on such refunds. Fairfax County had such enabling legislation, Fairfax County Code § 4-4-4, until it was repealed on April 7, 1992.

*Facts*

The Subject Property consists of real property improved by a five-story commercial office building containing approximately 300,000 rentable square feet of office space and a two-level underground parking garage. The Subject Property is located on Route 28, near Washington-Dulles International Airport.

In 1991, when the Subject Property was owned by GT Warehousing, Inc., the County initially assessed the property at $33,929,210.00. GT challenged the assessment before the Board of Equalization, which lowered the assessment to $29,640,000.00. In June, 1991, the Subject Property was transferred by a deed in lieu of foreclosure from GT to Hallmark. Hallmark is an affiliate of Maryland National Bank and South Charles Realty Corporation ("South Charles").[1] South Charles is a company established to own, manage, and dispose of real property acquired by banks and other lending institutions through foreclosures, deeds in lieu of foreclosure, bankruptcies, and other related means. South Charles marketed the Subject Property, and it sold on December 19, 1991, to Britt for $13,900,000.00, plus a performance guarantee which could have increased the purchase price to a maximum of $16,000,000.00. (As events transpired, the additional funds were not earned, and the Subject Property was sold for $13,900,000.00 in December, 1991). The County assessed the Subject Property at $27,664,735.00 as of January 1, 1992, less than two weeks after the sale to Britt. That assessment was later reduced by the Board of Equalization to $25,820,415.00.

Hallmark claims that the 1991 assessment of the Subject Property should be reduced further to $24,000,000.00, down from the $29,640,000.00 established by the Board of Equalization. Britt contends that the 1992

---

[1] Hallmark has since merged with Sunset Hill Corporation, which was substituted as a plaintiff in place of Hallmark by order of this Court dated March 7, 1997. For clarity, however, the Court will refer to Sunset Hill Corporation as "Hallmark."

assessment should be $16,000,000.00, rather than the County's assessment of $25,820,415.00.[2]

## General Principles

Real property is subject to local taxation in the manner prescribed by the Virginia General Assembly. Va. Const., art. X, § 4. Assessments of real estate are based on fair market value. Va. Const., art X, § 2. Fair market value is "the price property will bring when offered for sale by a seller who desires but is not obliged to sell and bought by a buyer under no necessity of purchasing." *Nassif v. Board of Supervisors*, 231 Va. 472, 479, 345 S.E.2d 520 (1986); *Board of Supervisors v. Donatelli & Klein*, 228 Va. 620, 628, 325 S.E.2d 342 (1985).

A taxpayer challenging an assessment of real property bears the burden of showing either that the property is assessed at more than its fair market value or that the assessment is not uniform in its application. Va. Code Ann. § 58.1-3984. *Board of Supervisors v. Telecommunications Indus., Inc.*, 246 Va. 472, 475, 436 S.E.2d 442 (1993); *Arlington County Board v. Ginsberg*, 228 Va. 633, 640, 325 S.E.2d 348 (1985). A clear presumption favors the validity of the assessment and can be rebutted only upon a showing of manifest error or total disregard of controlling evidence. *Donatelli & Klein, supra*, 228 Va. at 627. A taxpayer can demonstrate manifest error by showing a substantial disparity between fair market value and assessed value of the subject property. *Telecommunications Indus., supra*, 246 Va. at 477. The mere difference of opinion among appraisers, however, is insufficient to establish manifest error. *City of Norfolk v. Snyder*, 161 Va. 288, 293, 170 S.E. 721 (1933); *City of Richmond v. Gordon*, 224 Va. 103, 110, 294 S.E.2d 846 (1982). A court "must be hesitant, within reasonable bounds, to set aside the judgment of assessors; otherwise, the courts will become boards of assessment thereby arrogating to themselves the function of the duly constituted tax authorities." *Gordon*, 224 Va. at 110; *Board of Supervisors v. Leasco Realty, Inc.*, 221 Va. 158, 165, 267 S.E.2d 608, 612 (1980).

When the court finds manifest error in the assessment or disregard of controlling evidence, the court may properly conclude that the taxpayer has rebutted the presumption of correctness of the assessment, and the court may correct the assessment according to the evidence. *Ginsberg*, 228 Va. at 640. In

---

[2] Both the 1991 and 1992 County assessments were reduced by the Board of Equalization. For simplicity's sake, the Court generally will refer to the assessments as modified by the Board of Equalization as the "County's assessment(s)."

correcting the assessment, the court shall have all of the powers and duties of the authority that made the assessment. Va. Code Ann. § 58.1-3957.

## *Issues*

Neither Hallmark nor Britt contests the uniformity of the assessment for 1991 or 1992. Instead, the taxpayers argue that the County committed manifest error or totally disregarded controlling evidence. Hallmark contends that, in assessing the Subject Property in 1991, the County committed manifest error in that a substantial disparity exists between the assessment and Hallmark's appraisal evidence. Britt argues that the County disregarded controlling evidence, the fair market sale of the property for $13,900,000.00 to $16,000,000.00 on December 19, 1991, in assessing the property for 1992. The Court will consider the merits of the taxpayers' objections to the 1991 and 1992 assessments separately.

## *1991*

Britt contends that the Subject Property should be assessed at $24,000,000.00 as of January 1, 1991, rather than the $29,640,000.00 as set by the Board of Equalization.

The County contends that Hallmark's evidence adduced at trial as to any manifest error in the 1991 assessment amounts to no more than a difference of opinion among appraisers that is insufficient to rebut the presumption of correctness of the assessment.

The primary difference between the County's assessment for 1991 and the taxpayer's appraisal of the value of the Subject Property in 1991 is the capitalization rate selected by the respective appraisers and the calculation of "net operating income" to which the capitalization rate was applied in order to determine value.

Calvin Thomas, MAI, testified at trial on behalf of Hallmark. He opined that the fair market value of the Subject Property was $24,000,000.00 as of January 1, 1991.[3] Mr. Thomas examined the actual leases in the building and used the direct capitalization of income approach. He used a "loaded" capitalization rate of 10.81% to reflect the tax rate of $1.31/$100 of assessed value. He applied the loaded capitalization rate to the net operating income of the Subject Property before taxes, but after deductions for alterations and

---

[3] Plaintiff's Ex. # 44 summarizes Mr. Thomas' methodology and conclusions as to the value of the Subject Property as of January 1, 1991.

leasing commissions. (If the capitalization rate were not "loaded" for taxes, Mr. Thomas' capitalization rate would have been 9.5%. That 9.5% capitalization rate would have been applied to the Subject Property's net operating income after taxes.)

Mr. Thomas opined that if the Subject Property were fully leased on January 1, 1991, the value of the building would be $29,875,411.00. The Subject Property, however, was only 83% occupied on that date. Mr. Thomas estimated that the Subject Property would be "stabilized" (which he defined as 93% occupied) on January 1, 1993. Therefore, Mr. Thomas adjusted the $29,875,411.00 value if the Subject Property were 100% leased on January 1, 1991, for the "loss in value due to lease-up, leasing commissions and fit out" needed to bring the Subject Property to stabilization. He estimated that deduction to be $6,000,000.00. Deducting those expenses from the value of $29,875,411.00, Mr. Thomas arrived at an "as is" value of the building as of January 1, 1991, of $24,000,000.00 (rounded).

Larry Lewis, a senior assessor for Fairfax County, testified both as an adverse witness on behalf of the taxpayers and on behalf of the County. Mr. Lewis testified that he used the "income approach to valuation," or, more specifically, the "direct capitalization method—property residual technique" in determining the value of the Subject Property as of January 1, 1991.[4] When he assessed the Subject Property for 1991, he based his calculations of net operating income on his determination of the "economic rent" for the Subject Property. In determining the "economic rent" of the Subject Property, Mr. Lewis considered the actual income and expenses for the Subject Property in 1988, the most recent year for which such information was then available. The actual income and expenses of the Subject Property for 1991 were available and considered, however, when Hallmark challenged the 1991 assessment before the Board of Equalization.[5] He selected a capitalization rate of 7.95% plus a tax rate of 1.31% for a "loaded" capitalization rate of 9.26%, which he applied to net operating income before taxes in order to reach his assessment of $33,929,210.00 (later reduced by the Board of Equalization to $29,640,000.00). Unlike the taxpayer's appraiser, Mr. Lewis did not deduct leasing commissions and alterations from net operating income before applying his capitalization rate. Mr. Lewis criticized this methodology as in

---

[4] Mr. Lewis' methodology and calculations in assessing the Subject Property as of January 1, 1991, are summarized in Plaintiff's Ex. # 59.

[5] It is well settled that "economic rent is the measure to be used in capitalizing income for fair market value determination; however, contract rent is relevant as evidence of economic rent." *Fairfax County v. Nassif,* 223 Va. 400, 405, 290 S.E.2d 822 (1982).

effect applying a capitalization rate to cash flows rather than net operating income.

It is well established that evidence which merely presents a difference of opinion as to the value of the property is insufficient to meet the taxpayer's burden of proving manifest error. *City of Norfolk v. Snyder, supra; City of Richmond v. Gordon, supra.* As the Supreme Court explained in *Snyder*:

> The value of property is a matter of opinion, and there must necessarily be left a wide room for the exercise of opinion, otherwise courts will be converted into assessing boards and, in assuming to act as such, would assume powers lodged elsewhere by the lawmaking branch of government ... . Courts cannot substitute their judgment as to the valuation of property for the judgment of the duly-constituted tax authorities.

161 Va. at 292 (internal citation omitted).

Hallmark relies on the case of *Board of Supervisors of Fairfax County v. Telecommunications Indus., Inc.*, 246 Va. 472, 436 S.E.2d 442 (1993). That case involved assessments of business computers. The County assessed the computers at $709,921.00 in 1990, when the taxpayer's evidence of fair market value was $328,000.00. Similarly, in 1991, the computers were assessed at $432,960.00, when the taxpayer's evidence of fair market value was $180,000.00. In *Telecommunications Indus., Inc.*, the Supreme Court held that the trial court did not err in finding that "the computers were assessed at greater than fair market value and the disparity between the fair market value and the assessed value constituted manifest error." 246 Va. at 477.

Applying those principles to the evidence adduced at trial, the Court concludes that Hallmark has not met its burden of proving that the County committed manifest error in assessing the Subject Property in 1991. There was no evidence that the capitalization rate selected by either appraiser was not within the range of reasonable capitalization rates for property such as the Subject Property. Whether the appropriate capitalization rate is 10.81% or 9.26%, or whether the capitalization rate should be applied to net operating income after deductions for leasing commissions and alterations (the taxpayer's methodology) or without deduction for those items (the County's methodology) is no more than a difference in opinion among appraisers. For the Court to select one or the other capitalization rate or to calculate the net operating income for the Subject Property to which the capitalization rate is applied would be tantamount to the Court substituting its "judgment as to the

valuation of property for the judgment of the duly-constituted tax authorities." Furthermore, the disparity between the taxpayer's evidence as to fair market value ($24,000,000.00) and the County's assessment ($29,640,000.00) is not so substantial as to constitute manifest error under the rationale of *Board of Supervisors of Fairfax County v. Telecommunications Indus., Inc., supra.*

### 1992

Britt contends that the County committed manifest error and disregarded controlling evidence in assessing the Subject Property as of January 1, 1992. Britt argues that the County ignored the evidence of the sale of the Subject Property to Britt on December 19, 1991, just 13 days before the effective date of the assessment, for a sales price that would not exceed $16,000,000.00. The County assessed the Subject Property at $27,664,735.00 as of January 1, 1992.[6] That amount was reduced to $25,820,415.00 by the Board of Equalization.

The sales price of property is not conclusive as to its value, but it should be given substantial weight in determining fair market value. *Donatelli & Klein,* 228 Va. at 628.

The County maintains that the sale of the Subject Property on December 19, 1991, was in effect a forced sale, and therefore, the sale price is not reflective of the fair market value. Fair market value has frequently been defined as:

> The amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

*Black's Law Dictionary* (6th ed. 1990) at 597. *See also American Viscose Corp. v. City of Roanoke,* 205 Va. 192, 135 S.E. 2d 795 (1964) (citing cases).

Much evidence was adduced at trial as to whether the sale of the Subject Property in December, 1991, by Hallmark to Britt was a forced sale or a fair market sale. GT, which owned the Subject Property on January 1, 1991, transferred the Subject Property to Hallmark in June, 1991, by means of a deed in lieu of foreclosure. As mentioned above, Hallmark is a partnership formed by Maryland National Bank to hold title to the Subject Property. South Charles, a corporation affiliated with Maryland National Bank, was

---

[6] Mr. Lewis assessed the property for 1992. His methodology and conclusions for that year are summarized in Plaintiff's Ex. # 60.

charged with the responsibility of managing the Subject Property in such a way as to maximize value for the bank and to minimize the bank's losses related to its loan to GT.

South Charles determined that the Subject Property should be marketed and sold. South Charles retained Jones, Lang & Wooten, a major brokerage firm, to list and sell the Property. The Subject Property was marketed beginning in approximately July, 1991, and several offers were received, but none was higher than that of Britt.

Jeffery Cohen, the president of Britt, testified that Britt was under no pressure to buy the Subject Property. Britt had cash to invest at a time when the real estate market was in the midst of a major recession. Accordingly, Britt had many properties to choose among. After first learning of the availability of the Subject Property in July, 1991, Britt made a purchase offer for $16,000,000.00 in October, 1991. After learning that several tenants planned to vacate the building, the purchase price was reduced to $13,900,000.00. After a study period, the deed transferring the Subject Property to Britt was recorded on December 19, 1991. Mr. Cohen opined that Britt paid a fair price for the Subject Property, "right in line with other buildings [Britt was] buying; it was right in there with the market."

Erin Lee McComas, a former asset manager for South Charles, testified that South Charles had no time frame within which it had to dispose of the Subject Property. When the Subject Property was taken into South Charles' portfolio in June, 1991, it was assigned a book value of $16,500,000.00. Ms. McComas oversaw the marketing of the Subject Property. In her opinion, Britt paid a fair price for the Subject Property. She opined that the Subject Property was adequately marketed. An extensive "buyer package" was sent to over 100 potential purchasers. According to Ms. McComas, "we got a lot of feedback [from potential purchasers]. This was a thoughtful process." She did not think that the Subject Property was being sold at a deep discount: "Someone would have to come up with a lot of cash to get the building to stabilization. And it was only going to get worse with tenants leaving. I thought it was a very favorable transaction for [South Charles]."

John Norgun, a broker with Jones, Lang & Wooten, testified that the sale from Hallmark to Britt "was an arm's length transaction, based on a complete marketing of the property." In fact, the purchase price exceeded Jones, Lang & Wooten's estimation of the fair market value of the Subject Property.

Steven Donald Harlan, a former senior disposition officer of South Charles, testified he was in charge of the sale of the Subject Property. South Charles decided to sell the Subject Property because the building had several tenants who were planning to vacate the building. Given the cost of "re-

tenanting" the building and the uncertainty of the poor leasing market, the decision to sell was made. He testified that the Subject Property was the most extensively analyzed of all of the assets that he handled in his three years at South Charles. He was satisfied that $13,900,000.00 was a fair disposition for the Subject Property; $13,900,000.00 was on the "high end of [South Charles'] estimate of the fair market value of the property."

Mr. Lewis, the County's assessor, testified that he learned of the sale of the Subject Property when the deed was recorded in December, 1991. Although he considered the sale price in reaching his assessment, he gave it little weight because, among other reasons, he equated South Charles with the Resolution Trust Corporation and therefore considered the transaction to be a "dispositional sale" not reflective of fair market value. Mr. Lewis testified that he was not aware of South Charles' marketing efforts related to the Subject Property.

William C. Harvey, an MAI appraiser, testified on behalf of the County that he did not consider the sale of the Subject Property to be a fair market sale because the seller was "atypically motivated." He opined that the bank had taken back the Subject Property in an "in substance foreclosure" and was under pressure from Federal regulators to sell the asset. He thought that the $16,000,000.00 sales price represented "dispositional value" rather than "fair market value." In addition, he did not believe that the Subject Property was adequately exposed to the market. In his opinion, transactions that occur within four months of the property's being listed for sale are commonly dispositional sales. Mr. Harvey's opinions were not considered by the County in assessing the Subject Property as of January 1, 1992. He was retained by the County as an expert witness seven to ten days before trial to evaluate the December 19, 1991, sale of the Subject Property.

Having considered all of the foregoing testimony, the Court concludes that the County committed manifest error in assessing the Subject Property as of January 1, 1992, because the County virtually ignored the recent sales price of the Subject Property. With little inquiry, the County simply assumed the sale by South Charles was a forced sale not reflective of fair market value. Britt has shown by the detailed testimony of its witnesses concerning the circumstances of the sale that the Subject Property was adequately marketed, that Hallmark was a willing seller with a desire to sell but under no compulsion to sell, that Britt was a willing buyer that was under no compulsion to buy, that both Hallmark and Britt had a thorough knowledge of the relevant facts relating to the Subject Property and the real estate market in general. In short, this sale met the classic definition of a fair market sale, and the County committed manifest error in giving it little more than cursory

consideration. *See, e.g., City of Harrisonburg v. Taubman*, 212 Va. 28, 181 S.E.2d 654 (1971); *Arlington County Bd. v. Ginsberg*, 228 Va. 633, 325 S.E.2d 348 (1985).

The Court concludes that the 1992 assessment of the Subject Property should be corrected to $16,000,000.00 and an appropriate refund, with interest (if paid before April 7, 1992) be made.