## CIRCUIT COURT OF LOUDOUN COUNTY

WXIII/Oxford-DTC
Real Estate, L.L.C.

v.

Loudoun County
Board of Supervisors

April 5, 2004

Case No. (Law) 29368

BY JUDGE JAMES H. CHAMBLIN

This case came before the Court on February 23, 24, 25, and 26, 2004, for hearing on the First Amended Petition for Correction of Erroneous Assessment of Real Estate filed by WXIII/Oxford-DTC Real Estate, L.L.C. ("Oxford"), alleging that the Defendant, Board of Supervisors of Loudoun County, Virginia ("Board"), erroneously assessed Oxford's property known as the National Conference Center ("Center") (formerly the Xerox Document University), for the tax years 2001, 2002, and 2003.

After consideration of the evidence presented and the argument of counsel, I find that the assessments for all three years in question exceeded the fair market value, and the assessment for each year is corrected as follows:

| Tax Year | Assessment Corrected To |
|----------|-------------------------|
| 2001 | $52,000,000.00 |
| 2002 | 47,500,000.00 |
| 2003 | 54,600,000.00 |

### Subject Property

The Center consists of four large buildings on a 123.78 acre tract north of Route 7 near the Potomac River in Loudoun County. However, the 2003

assessment shows an acreage of 112.28 acres, after the conveyance of Xerox Drive for a road serving the property.

Three of the four buildings were built in 1974 by the Xerox Corporation for training of its employees. The buildings include offices, guest rooms, training facilities, meeting space, and eating facilities. In 1993, a fourth building was constructed for a new reception area with additional meeting space, warehouse space, and office space.

All four buildings contain almost 1.2 million square feet of gross building area. Xerox used the property exclusively for private training. Xerox never marketed it or used it as a conference center available to the public or other companies. The guest rooms were much smaller than those found at other conference or training facilities. A particularly unusual feature was that two rooms shared a common bathroom.

Oxford purchased the property from Xerox in June 2000 for $37,700,000. The purchase included the real property as well as tangible and intangible personal property of Xerox. Oxford allocated $30,900,000.00 of the purchase price to the real property and $6,800,000.00 to the personal property. The transaction also included a lease back arrangement with Xerox.

Xerox had engaged the services of a broker to sell the property. There was a competitive bidding process that ultimately led to Oxford's purchase. It was an arm's length transaction. I do not find from the evidence that Xerox sold the property at less than fair market value because of its financial and other legal problems in 2000. The property was truly unique (and it still is) at the time of the sale. Xerox had used it since 1974 as its private training center. It was known as the Xerox Training Center and later as Xerox Document University.

The lease back arrangement was attractive to both Oxford and Xerox. Through June 2005, Xerox is able to lease initially 200,000 square feet of warehouse and office space with the leased space declining incrementally. Also, Xerox agreed to pay Oxford for certain services related to leased space as well as for a certain amount of room-nights at the Center for its employees coming for continued training.

When Oxford acquired the property in June 2000, it borrowed $60,000,000.00 secured by a deed of trust on the property. I do not find this to be evidence that the property had a value of $60,000,000.00 in June 2000 or an admission by Oxford of such a value. Oxford's lender had the property appraised before making the loan, but the results of that appraisal were not admitted into evidence. Neither the deed of trust nor any other loan documents were offered into evidence. In light of Oxford's intention at the time of purchase to put almost $30,000,000.00 into renovating and

improving the property for its purposes (it did spend $23,000,000.00 on renovations within the first year) and the lack of any evidence that Xerox sold the property at less than market value, it is more likely than not that the loan was made based upon the anticipated value of the property after the renovations were completed.

Oxford bought the property to turn it into a national conference center providing a premiere meeting and training environment for groups from all over the world. To do so would require extensive renovation. Oxford would need to convert the property from a private training center identified with Xerox for many years to a profitable training center available to a worldwide market. It obviously would take time before Oxford would be in a position to expect income at a stabilized level.

Oxford commenced its renovation in late 2000 or early 2001. As of January 1, 2001, there were 919 guest rooms of which approximately 800 contained shared bathrooms (two rooms shared one bathroom). After the renovations were substantially completed in late 2001, there were 951 guest rooms, of which 192 rooms still shared bathrooms (two rooms shared one bathroom). Oxford spent approximately $23,000,000.00 out of a budget of $29,000,000.00 for the renovations. Oxford spent $5,000,000.00 on furniture, fixtures, and equipment ("FF&E"), $14,000,000.00 on construction, $3,000,000.00 on "soft costs" (fees, architects, etc.) and $1,000,000.00 on advertising. Some guest rooms used by Xerox as offices had to be converted back to guest rooms. The property has no large conference room or ballroom. Oxford planned to construct one, but later decided not to because of the down turn in the economy.

Beginning in 2001, the economy started to decline. The high-tech industry in the Dulles corridor started to decline. Oxford's future income projections were not only premised on the renovations and extensive marketing but also on market availability. The Center is near Washington Dulles International Airport and the Dulles Tech Corridor (the "DTC" in Oxford's name stands for "Dulles Tech Corridor"). Oxford expected business from companies using Dulles Airport and business generated by the tech industry. The tragic events of September 11, 2001, made matters worse.

*Pre-2001 Assessments*

Xerox had previously filed suit contesting the assessments for the years 1997 through 2000. The Board and Xerox reached a settlement in 2003 whereby it was agreed that the assessments of the property were set at the following:

| Tax Year | Agreed Assessment |
|----------|-------------------|
| 1997 | $60,000,000.00 |
| 1998 | 55,000,000.00 |
| 1999 | 50,000,000.00 |
| 2000 | 45,000,000.00 |

A final order was entered by this Court on July 29, 2003, approving the settlement.

## Standard of Review of the Subject Assessments

This proceeding is brought pursuant to Va. Code § 58.1-3984, under which the "burden of proof shall be upon the taxpayer to show that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise illegal. . . ."

There is a presumption that the assessment is valid, and the presumption can be rebutted only upon a showing of manifest error or total disregard of controlling evidence. *Board of Sup. v. Telecommunications Industries*, 246 Va. 472, 475 (1993).

If error is found in the assessment, then the presumption is rebutted and this Court may order that the assessment be corrected under Va. Code § 58.1-3987.

It is recognized that, because courts are not duly constituted taxing authorities, they should be reluctant, within reasonable bounds, to change the assessor's judgment. *See Board of Supervisors v. Leasco Realty, Inc.*, 221 Va. 158, 165 (1980).

## 2001 Assessment

Despite an agreed assessment for tax year 2000 of $45,000,000.00 and a sale of the property for $37,700,000.00 (which sale included personal property as well as real property) in June 2000, the County assessed the property for 2001 at $64,182,600.00. It represents an increase of 42.63% over the 2000 assessment after the Board agreed to four years of declining assessments from 1997 through 2000. The Board can point to nothing causing such a dramatic increase in the assessment except the change in ownership and intended use of the property. It pointed to no change in market conditions or the economy that could have caused such an increase.

The Board does not want this Court to "second-guess" the assessor by examining the information used to determine the 2001 assessment. It is hard not to second-guess the assessor when he increased the assessment by over 42% in one year in the absence of some objective justification for the sharp increase.

There are three approaches to appraising real estate, cost, income, and sales comparison. The application of these approaches to appraising the property is a central issue in this case.

Regardless of the presence of income and sales related information in his file, the assessor appraised the property for 2001 using a cost approach. For some reason, he never adequately explained why the County has the property divided into nine structures when there are only four buildings (other than "that's the way it is in the system"). However, Oxford's expert appraiser did not feel this was a problem because the parties did agree on the total square footage of the four buildings.

The assessor determined the Replacement Cost New (RCN) for each structure by multiplying the square footage of each structure by a construction cost factor he obtained by consulting the Marshall Valuation Service, a service showing current construction costs for different types of buildings in different areas of the country. Then he took a 30% depreciation due to age and a 20% reduction for functional obsolescence for each structure. He took no deduction for economic obsolescence. He arrived at a total net improvement cost of $54,589,600.00 to which he added a land value of $77,500.00 per acre ($77,500.00 x 123.78 = $9,592,295.00), rounded to $9,593,000.00 for a total assessment of $64,182,600.00.

He also did an income approach arriving at a value of $67,297,895.00 (see Plaintiff's Exhibit A-4), but he decided to set the assessment at the cost approach value.

He did not do a sales comparison approach because of the lack of comparable sales. The Center is very unique. There is no other property like it in Loudoun County. No evidence was presented of any comparable property anywhere in the United States. The failure to do the sales comparison approach is not an issue in this case because the assessor and all the expert appraisers who testified all agree that the property cannot be appraised using the sales approach.

Oxford argues that, under *Tidewater Psychiatric Inst., Inc. v. City of Virginia Beach*, 256 Va. 136 (1998), the 2001 assessment, being based solely on RCN or a depreciated reproduction cost method, is not entitled to a presumption of correctness because the assessor did not consider and properly reject the income method and, as a result, Oxford need only meet the lesser burden of proving that the assessment was erroneous as opposed

to the higher burden of proving manifest error. I agree, and, for the reasons stated below, Oxford has proven not only an erroneous assessment but also manifest error.

I find the following to be the areas of manifest error and/or disregard of controlling evidence in the 2001 assessment.

1. The assessor used the same 30% depreciation for all four buildings even though three were built in 1974 and one in 1994.

2. The assessor did not use an age/life method of depreciation and did not calculate the effective age or useful life of any structure. The assessor used what he called a "modified age/life method" because he felt the property had been maintained at substantial expense by Xerox, but he had no specifics on what Xerox had spent. He had not visited the property, and he complained that Xerox had not given the County any income or expense figures for 1999 or 2000.

3. The assessor gave no deduction for economic obsolescence, but did not study any trends in the economy or marketplace. He could not recall the market trends in 2001.

4. The assessor gave no market data to support his 20% depreciation figure.

5. The assessor consulted Marshall for the construction cost figures, but Marshall has no cost for training centers or conference centers. He said he looked at the cost for offices, hotels, and dormitories as found in Marshall, but he never explained how he arrived at the cost figure he used.

6. The assessor valued the property using a cost approach when all the experts who testified agreed that a prospective purchaser would never use the cost approach in deciding what to offer for the property.

7. As to the income approach used by the assessor (which led to a higher value), the manifest errors included:

a. The assessor completely ignored the actual June to December 2000 income and expenses figures supplied by Oxford before January 1, 2001, because the property was undergoing renovation and there was a change in the nature of the occupancy. However, as of January 1, 2001, he did not know the extent or the amount of the renovations or their impact on the business at the Center.

b. The value of the property is due to the business being conducted on the property. The income approach initially determines a value for the business from which a value of each business asset is derived. The income from the property is not simply rent. If it were, then a value could be determined by dividing the income (rent) by an approximate capitalization rate ("cap rate"). Here the income comes from not only the Xerox rent, but also the income

from the groups using the Center for conferences, this income is referred to as Complete Meeting Package or "CMP." The assessor used a computer-assisted income approach program for a full service hotel. See Plaintiff's Exhibit A-4. The property is not a hotel. The assessor did not attempt to get income and expense figures for a comparable training center. He ignored Oxford's own figures for June to December 2000.

c. The assessor used hotel occupancy and room rates without justifying the rates he used.

d. The assessor did not deduct for income attributable to intangibles and a replacement allowance.

e. The assessor assumed that the Center's income would be stabilized in 2001. There is no justification for that in light of the ongoing renovations, the change in use, Oxford's new marketing efforts, Oxford's own figures for the last half of 2000, Oxford's forecasts for 2001, or the trends for training centers.

f. The assessor offered no justification for increasing the cap rate to account for expenses, *e.g.*, rent losses or other shortfalls.

I am aware that the 2001 assessment had to have been based on information known to the assessor at the time he made the assessment, probably late 2000. It could not be based on what actually occurred later, *e.g.*, projections that did not pan out or actual income or expenses in later years. However, by the end of 2000, the assessor did have Oxford's income and expense figures for the last half of 2000, which were much less on an annualized basis than the figures used by the assessor in his income approach. (See Plaintiff's Exhibits A-3 and A-4.) The assessor says he placed no weight on the figures supplied by Oxford because the use of the property had changed. It appears to me that the assessor just determined that, because of the sale and the change of use, the property would be like a hotel or motel and the value could be determined by the income approach using data from other Loudoun hotels or motels. But the Board offered no evidence to support this conclusion by the assessor. There is no evidence that the assessor made an investigation to determine exactly what Oxford was going to do with the property. And even if the assessor did determine that Oxford was going to convert the property from a private training center to a national public conference or training center, there is no evidence that the assessor tried to determine the market trends for training centers as of January 1, 2000.

■■■■■■■■■■■■

*2002 Assessment*

The County assessed the property for tax year 2002 at:

Land          $10,211,900.00
Improvements      55,962,800.00

Total      $66,174,700.00

Although the assessor did do a cost approach analysis similar to that done in 2001 by which he arrived at a net improvement cost for the structures at $64,416,200.00 (see Plaintiff's Exhibit B-2), the 2002 assessment is clearly based on an income approach by which he arrived at a value of $66,174,662.00, rounded to $66,174,700.00. (See Plaintiff's Exhibit B-3.) The assessor used the total value of $66,174,700.00 and then deducted $10,211,900.00 (123.78 acres x $82,500.00 per acre) for the land value leaving $55,962,800.00 as the value for the improvements.

In the cost approach, the assessor used 30% depreciation, 20% functional obsolescence, and another 10% economic obsolescence as a result of "9/11."

In the income approach, the assessor again used the Full Service Hotel spreadsheet. He had Oxford's income and expense figures for the second half of 2000 and all of 2001.

I find the following to be the areas of manifest error and/or disregard of controlling evidence in the 2002 assessment.

1. The assessor again treated the property as having stabilized income even though the renovation was not complete, the economy was turning down, and world events, such as "9/11" were affecting the Center's business.

2. The assessor again used an occupancy rate and income and expense figures based on hotels such as Lansdowne Resort, Holiday Inn Dulles, and Dulles Marriott. They are not similar to the Center. The Center does not seek business from the general hotel or motel using public, vacationers, or overnight business travelers.

3. The assessor was unaware of the actual number of rooms available for occupancy during the renovation.

4. The assessor used an occupancy rate of 70%, but he did not know if a conference facility was averaging 70% occupancy as of January 1, 2002.

5. Without citing an authority or other reason for doing so, the assessor adjusted the cap rate (a 2% increase) to take into account a two-year period needed for income to stabilize.

6. The assessor offered no authority or justification for a reduction of only 10% for economic obsolescence in light of the devastating impact on the travel and conference industry after September 11, 2001.

7. There is no deduction for income attributable to intangibles and replacement allowance.

8. A base cap rate of 11% used by the assessor is very low considering the proximity to Dulles Airport and the events of "9/11."

9. Same deficiencies cited for 2001 as are applicable to 2002.

*2003 Assessment*

For 2003, the County assessed the property at:

| | |
|---|---|
| Land | $12,227,300.00 |
| Improvements | 57,772,700.00 |
| Total | $70,000,000.00 |

As he had done in 2002, the assessor did a cost and income approach for 2003. His cost approach showed a total net improvement cost of $93,148,399.00. See Plaintiff's Exhibit C-1. He used only 35% depreciation with no deduction for functional or economic obsolescence.

Using an income approach based on a Full Service Hotel spreadsheet, the assessor determined the value for the property to be $69,909,937.00. See Plaintiff's Exhibit C-4.

The assessor set the total assessment for 2003 at the rounded figure of $70,000,000.00. He assigned $12,227,300.00 to the land based on $108,900.00 per acre multiplied by 112.28 acres, the acreage remaining after an out-conveyance before January 1, 2003. This left an improvements assessment of $57,772,700.00.

I find the following to be the areas of manifest error and/or disregard of controlling evidence in the 2003 assessment.

1. The assessor offered no justification for non-economic or functional obsolescence in 2003. All the rooms had not been converted from shared bathrooms. The economy was still depressed, and conference center business was down as a result of "9/11" and other world events.

2. The assessor again used hotel and motel figures for determining training center figures without justification.

3. The assessor again used an increase in the cap rate to account for time to stabilize income.

4. Again, no deduction was given for income attributable to intangibles or for a replacement allowance.

5. The same deficiencies cited for 2001 and 2002 are as applicable to 2003.

*Conclusions as to the 2001, 2002, and 2003 Assessments*

For the reasons stated above, I find that Oxford has rebutted the presumption of the validity of the assessments for 2001, 2002, and 2003.

Further, I find that the assessments should be corrected as set forth below.

*Corrections to 2001, 2002, and 2003 Assessments*

Oxford presented the testimony of its expert, David C. Lennhoff, an appraiser with significant experience in the appraisal of real estate whose value is due to the business being operated on the real estate. His qualifications are extensive. See his curriculum vitae admitted as Plaintiff's Exhibit O.

The Board offered the testimony of its expert, S. Kirk Johnson, and William C. Harvey, II. Both are duly qualified real estate appraisers. See their qualifications admitted as Defendant's Exhibits 1 and 2.

Both Lennhoff and Johnson appraised the property for the years in question. Harvey offered his opinion on Lennhoff's appraisal, and the differences between the two appraisals.

The differences between the two appraisals in relation to the assessment for each year are set forth below:

| *Tax Year* | *Assessment* | *Johnson Appraisal* | Lennhoff Appraisal |
|---|---|---|---|
| 2001 | $64,182,600.00 | $63,500,000.00 | $52,000,000.00 |
| 2002 | 66,174,700.00 | 64,050,000.00 | 47,500,000.00 |
| 2003 | 70,000,000.00 | 69,750,000.00 | 54,600,000.00 |

After consideration of the evidence presented, I am more persuaded by the testimony of Lennhoff than Johnson or Harvey. I give greater weight to Lennhoff's methodology. I think he has the better, more reasonable approach to determining the value of the property.

## *Lennhoff Appraisals*

Lennhoff determined that the best way to value the property is by an income approach. Sales comparison approach is clearly not applicable because there are no comparable sales. The cost approach is not applicable because market participants would not use it.

Overall, Lennhoff based his opinion as to value more closely to exactly what was occurring with the property than did Johnson. Lennhoff recognized that the use of the property was being changed and, as a result, the value of intangibles, such as start-up expenses and the cost of assembling a work force, has to be determined before the value of the real estate can be ascertained. Johnson did not consider a value for the intangibles. This appears to be the difference between the older Rushmore method (intangibles excluded) and the newer "Course 800" method (intangibles included). I find the "Course 800" method to be the currently more accepted method to value real estate connected with or part of a going concern.

According to Lennhoff, the value of the property is due to the business, the conference center business. The real estate is just a part of the going concern, the Center. Because the tax is levied only on the real estate according to its value, the value of the real estate must be segregated out from the value of the going concern.

Lennhoff's methodology in determining the value of the real estate is as follows.

The total assets of a business are composed of the following:

a. Tangible Personal Property, which includes:
  (1) FF&E
  (2) Inventory
b. Real Property
c. Intangibles (Intangible Personal Property), which includes, *e.g.*:
        (1) Assembling a work force
        (2) Business start-up costs
        (3) Any favorable contracts

Determine the income from the Total Assets of the Building (TAB) and deduct from it the business's expenses, which can be categorized as departmental, undistributed, and fixed expenses. The result is the net income, which is divided by the appropriate cap rate to get the value of the TAB.

Next, the income attributable to the tangible personal property and the intangibles must be deducted from the net income. The result is the net income attributable to the real estate, which is then divided by the appropriate cap rate to ascertain the value of the real estate.

Lennhoff did this analysis for each year to get his opinions as to value as set forth in Plaintiff's Exhibit D-6.

Lennhoff did correct the mathematical errors in his calculations provided in discovery when he testified. Harvey pointed out that, when Lennhoff corrected the errors, he also changed some other income and/or expense figures. However, the Board offered no evidence that the figures Lennhoff ultimately used during his testimony were incorrect. Lennhoff denied that he used the changed figures to keep his appraisals closer to the original numbers.

Harvey criticized Lennhoff for using a cap rate derived from a hotel cap rate provided by a recognized authority, Korpacz, which does not include residual intangibles while Lennhoff based his values including residual intangibles. In rebuttal, Lennhoff stated that Korpacz was only one of four sources he consulted to determine a cap rate. Lennhoff had the same rebuttal to Harvey's criticism that it was wrong to add an entrepreneurial incentive to the remaining renovation costs for 2001 and 2002 (see Plaintiff's Exhibits D-3 and D-4) when Lennhoff used an elevated cap rate derived from Korpacz.

The Board attacked Lennhoff because he based his appraisals solely on the income method, while Johnson based his appraisals on a weighted combination of the cost and income methods. Lennhoff is correct in basing the value of the property solely on the income method. Because of the property's uniqueness, its value is derived from its use, not from the land and the buildings. It is reasonable, as testified to by Lennhoff, that anyone interested in purchasing the property would determine its value using an income approach. Its value is a function of the income that could be generated by the business conducted on the property.

## Johnson Appraisals

Johnson utilized all three approaches, cost, income, and sales comparison, in arriving at his appraisals. See Defendant's Exhibits 3 through 21. In the end, he used a weighted approach giving the value indicated by the income approach twice the weight as the value indicated by the cost approach. See Defendant's Exhibit 21. His methodology differed from Lennhoff's.

I find the following concerns with Johnson's appraisals.

1. He had less knowledge about training centers in the United States than Lennhoff.

2. Johnson did not analyze the decline in revenue per room for conference facilities in the metropolitan area in 2001 and 2002.

3. He did not accept the "Course 800" methodology that gives value to intangibles in a going concern. Lennhoff helped to develop and ascribes to "Course 800." Johnson has never taken the course. Johnson feels that intangibles should only come into play if it is something that adds income (*e.g.*, a name such as Marriott). I think the "Course 800" methodology is better reasoned.

4. He failed to take into account a collection loss or a management fee against the Xerox rental income.

5. His sales comparisons were all sales of going concerns, but he did not adjust the sales prices for any personal property included in the sales. He used adjustments based on "superior," "similar," or "inferior" to get a comparison value per room range. Comparing hotel or motel sales to a training center sale is meaningless.

6. Johnson's appraisals go up for each year when the trend for income was going down in 2001 into 2002. His value by income approach goes down from 2001 to 2002, but his appraisal goes up for the same period.

7. He used 951 rooms for the 2001 appraisal when all the rooms had not yet been renovated. As of January 1, 2001, there were 919 rooms.

8. He took no deduction for intangibles.

9. He used an insufficient amount for "reserves" based on 1% of total income.

## Conclusions

I give the greater weight to the opinion of Lennhoff. The assessments should be corrected to the values found by Lennhoff.

Therefore, I find that the correct fair market values are as follows:

| Tax Year | Assessment |
| --- | --- |
| 2001 | $52,000,000.00 |
| 2002 | 47,500,000.00 |
| 2003 | 54,600,000.00 |

Oxford is entitled to a refund of taxes paid based on the erroneous assessments with interest.